791 A.2d 942

BERKSHIRE LIFE INSURANCE COMPANY

v.

MARYLAND INSURANCE ADMINISTRATION et al.

Nos. 1248, 1935 Sept.Term, 2000.

Court of Special Appeals of Maryland.

Feb. 27, 2002.

630

Bryan D. Bolton (Jefferson L. Blomquist and Funk & Bolton, P.A., on the brief), Baltimore, for appellant.

Christina Gerstung Beusch, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellees.

Argued before SALMON, KENNEY, and RAYMOND G. THIEME, Jr. (Ret'd, specially assigned), JJ.

KENNEY, Judge.

This appeal arises out of two separate decisions by the Circuit Court for Baltimore City in favor of appellee, Maryland Insurance Administration ("MIA"), and against appellant, Berkshire Life Insurance Company ("Berkshire"). The first decision was the denial of Berkshire's request to stay the Insurance Commissioner's (the "Commissioner") Final Order requiring it to pay a monetary award to an individual insured, and it is the subject of Appeal No. 1248, September Term, 2000. The second decision affirmed the Commissioner's Order and is the subject of Appeal No. 1935, September Term, 2000. These appeals were consolidated on the parties' motion on December 29, 2000. Appellant raises the following two issues on appeal:

I. Appeal No. 1248: Under the separation of powers doctrine and constitutional and statutory tenets of due process, was Berkshire Life entitled to a stay of the Commissioner's Substituted Conclusions of Law and Final Order

("Final Order") pending judicial review in the circuit court where the administrative order required only the payment of a monetary award to an individual insured and Berkshire Life agreed to post an adequate cash bond?

II. Appeal No. 1935 Did the circuit court commit reversible error in affirming the Final Order of the Commissioner where the Commissioner ignored the standard of review for a Recommended Decision of an ALJ mandated by the insurance regulations and substituted his determinations for those of the ALJ?

## FACTUAL AND PROCEDURAL BACKGROUND

This case involves three different disability policies purchased by Howard F. Rosenstein: Policy No. NC216442 dated February 11, 1976 (the "1976 Policy"), Policy No. NC240959 dated September 12, 1980 (the "1980 Policy"), and Policy No. NC247381 dated November 23, 1981 (the "1981 Policy"). The 1976 policy provided coverage for total disability, which is defined in the policy as

the complete inability of the Insured to engage in his occupation, except that if indemnity has been paid for 120 months in any period of continuous disability, and this policy provides indemnity in excess of 120 months, then for the remaining duration of that period of continuous disability, the term "total disability" shall mean the complete inability of the Insured to engage in any gainful occupation in which he might reasonably be expected to engage, having due regard to his education, training, experience and prior economic status[.]

The 1980 policy insured against total disability as well, which is defined as

your inability to engage in your occupation, except: the terms of this policy may provide that the indemnity payments are to be made beyond the policy anniversary that falls on or most nearly follows your sixty-fifth birthday. In such a case, for benefits that are to be paid for disability after such anniversary, or after disability benefits have been

paid for a period of two years (if this is longer), the term "total disability" will have this meaning: your inability to engage in any gainful occupation in which you might reasonably be expected to engage, with due regard to your education, training, experience, and prior economic status.

The 1980 policy also contained a supplementary agreement covering residual disability benefits. Residual disability is defined by the policy as "(1) your inability to do one or more of your important daily business or professional duties; or (2) your inability to do these duties for the length of time that they usually require." The policy further provides that residual disability payments would be made, *inter alia*, if "you enter a period of such disability right after the end of a period of total disability." The 1981 policy covered only total disability as previously defined in the 1980 policy.

Mr. Rosenstein bought the first policy when he was working as a Special Agent in the Criminal Investigation Division of the Internal Revenue Service. Mr. Rosenstein went into business for himself in September 1980, and continued to operate his business until the time of his disability claim.

Although Mr. Rosenstein is licensed to practice law in Maryland, he has always worked as an investigator specializing in financial and fraud investigations. When he opened his business, Mr. Rosenstein began consulting with private firms in addition to state and local governments in both criminal and private matters. Mr. Rosenstein described some of his work as follows:

> My expertise in financial and fraud investigations has encompassed the reconstruction of complicated factual and financial transactions to determine whether fraud has occurred; locating funds wrongfully taken from financial institutions and businesses; assisting defense counsel in white collar crime prosecutions and investigations; assisting insurance companies in reconstructing financial documents, books and records in order to evaluate their coverage and defense of claims; and assisting attorneys and their clients in the resolution of tax disputes, criminal and civil.

He testified that he often helped obtain successful outcomes for his clients and that he worked on a number of high profile cases, including representing the Maryland Deposit Insurance Fund in cases involving Old Court Savings & Loan, Ridgeway Savings & Loan, Community Savings & Loan, and Merritt Commercial Savings & Loan.

With Mr. Rosenstein's success came his involvement in increasingly complex and high profile cases. Between 1991 and 1994, he was working on two demanding cases, one in Rhode Island and one in New Jersey. These cases required frequent travel, adherence to strict deadlines, review of voluminous amounts of material, and supervision of a number of other people. Mr. Rosenstein was under "tremendous pressure." Nevertheless, he found the work to be "a lot of fun. I was having a great time but it was hard and it took its toll on me so during that period I first started to note small lapses of short term memory, loss of concentration."

After some soul searching, Mr. Rosenstein decided that the job was "just taking too heavy a toll on me, physically and mentally." In late 1994, therefore, he decided to cut back on the sprawling complex cases requiring travel in favor of local cases that, although complicated, were not as large in terms of document review.

Although Mr. Rosenstein reduced his workload, he continued to notice "little slippages" in concentration and short term memory during 1995 and 1996. In addition to these problems, in November of 1996, he began suffering from substantial pain in his knees, headaches that were sometimes incapacitating, fatigue, and "constant indigestion." Mr. Rosenstein sought the help of Dr. Steven Diener, an internist who diagnosed and began treating him for hypertension, reflux, and a hiatal hernia.

Although he was now being treated, Mr. Rosenstein's problems grew worse. The pain in his knees did not subside, and he continued to have problems with concentration and memory. He was later diagnosed with sleep apnea, and Dr. Diener suggested that Mr. Rosenstein might also be suffering from

depression. Mr. Rosenstein continued to work until January 1997, when he finished his duties in a white collar defense case. He took no new cases despite being approached to do so.

Notwithstanding his various problems, Mr. Rosenstein believed at that time that he would be returning to work. His health continued to deteriorate, however, and he began seeing a rheumatologist, Dr. Matthew P. Bunyard, and a psychiatrist, Dr. Lawrence R. Hyman, in addition to Dr. Diener. In March of 1997, after his "third, or fourth or fifth visit with Dr. Diener," Mr. Rosenstein filed a disability claim with Berkshire under all three policies. If he was found to be totally disabled, he would receive payments of $1,000 a month for each policy for a total of $3,000 per month. These benefits would be paid until he reached age 65. ·

On his claim form, he listed "Mid 1996 to present" as the period of disability. His duties were listed as "expert in the analysis of complex factual and financial transactions, reconstruction of documentation related to those matters including expert testimony," and his symptoms were listed as "dementia, headaches, sleep deprevation [sic], stress, hypertension, depression, reading sight deterioration, arthritis." He stated that he was unable to perform the following job duties: "review numerous documents, large analyses, memory loss, testimony at hearings and trials, meetings involving stress." Mr. Rosenstein also enclosed a "description of occupation" form with the claim form. Dr. Diener submitted an "Attending Physician's Statement," which included statements in preprinted blanks that Mr. Rosenstein was totally disabled from December 1996 and that he was also partially disabled from December 1996.[1]

In April 1997, Berkshire asked Mr. Rosenstein for copies of his personal and business income tax forms for the period

---

1. Question 9 on the form asked for the period of total disability, and Question 10 on the form asked for the period of partial disability.

1992 through 1996, as well as for other financial information. Mr. Rosenstein provided this information to Berkshire.

On May 14, 1997, Bruce Hodsoll, Berkshire's Vice President of Claims Management, met with Mr. Rosenstein at Mr. Rosenstein's home. During that meeting, Mr. Hodsoll offered to settle the claims under all three policies for $36,000, but Mr. Rosenstein declined the offer. Mr. Hodsoll then indicated that, if Mr. Rosenstein did not accept the offer, Berkshire was likely to pay only under the residual disability benefit clause of the 1980 Policy for a total of $3,000. Mr. Hodsoll indicated also that he would review the matter again to determine if it would be possible for Berkshire to increase its offer.

On July 2, 1997, after receiving no answer or further contact from Mr. Hodsoll, Mr. Rosenstein wrote to James Zelinski, President of Berkshire. Mr. Rosenstein copied his letter to MIA, which responded by opening an investigation. Berkshire responded to the letter by sending Mr. Rosenstein the first of two $1,500 checks as a residual disability benefit under the 1980 policy. It denied the claim for total disability benefits, despite the language in the policy requiring a period of total disability prior to payment of residual disability benefits.

In early October 1997, Dr. Diener submitted a Progress Report to Berkshire again stating that Mr. Rosenstein was totally disabled and had been from January 13, 1997. Berkshire again advised Mr. Rosenstein that it believed he was only entitled to a residual disability benefit. Mr. Rosenstein then wrote a letter to Thomas W. Loftus, the Berkshire Claims Consultant assigned to his claim, with a series of questions concerning Berkshire's denials of his claims as well as Berkshire's failure to seek additional medical information from Dr. Bunyard. Berkshire responded that "based on its 'evaluation of the medical records' and Mr. Rosenstein's failure to prove the required loss of income," it did not believe that he was entitled to anything more than minimal benefits under the residual disability coverage.

On November 13, 1997, Mr. Rosenstein filed a Supplemental Disability Claim, again seeking total disability benefits. Berkshire denied this claim. Dr. Hyman wrote to Berkshire on

December 30, 1997, with information on Mr. Rosenstein's condition and advising that, in his opinion, Mr. Rosenstein was totally disabled.

Berkshire referred Mr. Rosenstein's claim file to Laurie Cohen, a Ph.D. psychologist under contract with it. Dr. Cohen reached no conclusion from her review but requested further information. Subsequently, she had contact with Dr. Hyman concerning her questions. Apart from the foregoing, Berkshire took no additional steps, including an independent medical evaluation, to investigate the claim.

During this same period of time, MIA was conducting an investigation. It issued a form determination letter in September 1997 indicating that Berkshire was acting in accordance with the terms of its contract and was therefore not in violation of the Insurance Article.

Mr. Rosenstein sought reconsideration of this decision by writing a letter to Senator Barbara Mikulski. Senator Mikulski forwarded the letter to Governor Parris Glendening, who forwarded it to MIA. MIA subsequently reopened its investigation, and assigned to the case an investigator with special experience in handling disability claims. After this subsequent investigation, the MIA concluded that Berkshire's refusal to pay total disability benefits based on the "abundance of medical documentation supporting Mr. Rosenstein's disability" was arbitrary and capricious and was in violation of Md.Code Ann. (1997), § 27–303 of the Insurance Article ("Ins.").

Berkshire challenged this determination, and the matter was referred to the Office of Administrative Hearings ("OAH"). The Administrative Law Judge ("ALJ") held a hearing on March 29–30, 1999. On April 16, 1999, the ALJ issued her Recommended Decision. The ALJ concluded that Berkshire's

refusal to pay total disability benefits for the period from March 1997 through October 1997 was not in violation of Md.Code Ann., Ins. II, § 27–303(2) (1997 & Supp.1998).[2] I

---

2. Ins. § 27–303(2) reads: "It is an unfair claim settlement practice and a violation of this subtitle for an insurer or nonprofit health service plan

further conclude, as a matter of law, that the Licensee's decision to terminate review of the claim for total disability benefits for the period from November 1997 through July 1998 [3] was arbitrary and capricious and in violation of Md.Code Ann., Ins. II § 27–303(2) (1997 & Supp.1998).

MIA filed exceptions to the recommended decision, and on April 17, 2000, the Commissioner issued his Final Order (the "Order"), which reads, in pertinent part:

ORDERED, that the Findings of Fact in the Recommended Decision issued in this matter by [the ALJ], is hereby AMENDED IN PART, REJECTED IN PART and AFFIRMED IN PART consistent with this Order; and it is hereby further

ORDERED, that the refusal of [Berkshire] to pay total disability benefits for the period from January 13, 1997 (the date on which the "waiting period" commenced) through October 1997 was arbitrary and capricious in violation of [Ins. § 27–303(2)] and, consequently, that part of the ALJ's recommended Conclusion of Law be and is hereby REJECTED;

ORDERED, that [Berkshire's] decision to terminate review of the claim for total disability benefits for the period from November 1997 through July 1998 was arbitrary and capricious in violation of [Ins. § 27–303(2)] and, consequently, that part of the ALJ's recommended Conclusion of Law be and is hereby AFFIRMED; and it is hereby further

ORDERED, that the Recommended Order of the ALJ that the claim for the period from November 1997 to July 1998 be remanded to [Berkshire] for a determination of [Mr. Rosenstein's] eligibility for total disability benefits be and is hereby REJECTED; and it is further

---

to: ... (2) refuse to pay a claim for an arbitrary or capricious reason based on all available information[.]"

**3.** Berkshire's refusal to pay benefits after July 1998 is the subject of separate litigation and is not at issue here.

ORDERED, that [Berkshire] pay restitution to [Mr. Rosenstein], in the amount of benefits for coverage for "total disability" provided in each and all of [Mr. Rosenstein's] three disability Policies for the period January 13, 1997 (when the "waiting period" commenced) through July 13, 1998, the cut-off in the MIA's March 4, 1999 determination letter, less the amount already paid by [Berkshire] to [Mr. Rosenstein] for residual disability benefits[.]

Berkshire then petitioned for judicial review in the Circuit Court for Baltimore County on May 17, 2000. On May 31, 2000, Berkshire filed a Motion for Stay of Administrative Order Pending Judicial Review. The court held a hearing on the motion on July 5, 2000, and denied it the same day. Berkshire appealed this ruling, which is the subject of Appeal No. 1248, September Term 2000.

The circuit court held a hearing on the merits of Berkshire's petition for judicial review on October 13, 2000. It affirmed the Commissioner's Final Order in an oral ruling that same day. The court filed a written order on October 16, 2000. Berkshire also appealed this ruling, which is the subject of Appeal No. 1935, September Term, 2000.

## DISCUSSION

### I. Appeal No. 1248, September Term, 2000

Berkshire's first argument is that the circuit court abused its discretion by refusing to stay the Commissioner's order. Berkshire argues that the court's decision violated both the separation of powers doctrine and its due process rights. Moreover, it argues that, because the court looked at the four factors for entitlement to preliminary injunctive relief and then ordered Berkshire to comply immediately with the Commissioner's administrative order, its decision amounted to an improper injunction. It also argues that, because the Commissioner's order was not stayed by operation of law, if Berkshire ignored it, it would risk further penalties. Thus, Berkshire argues, it "was required to do more to obtain a stay in this administrative case than it would had it been appealing

a court order awarding disability benefits after the trial of a contract action." MIA argues that the denial of a stay of an administrative order is not an appealable order.

The parties advised this Court at oral argument that Berkshire had not yet paid Mr. Rosenstein, because its appeal to this Court operated as a stay. Rule 8–422(a) provides that "an appellant may stay the enforcement of a civil judgment, other than for injunctive relief, from which an appeal is taken by filing a supersedeas bond." Berkshire filed a supersedeas bond on August 11, 2000. Thus, the payment to Mr. Rosenstein has effectively been stayed, rendering this issue moot. Even it if were not moot, we have no jurisdiction over this issue. We explain.

An order by the Insurance Commissioner is not automatically stayed by operation of law when a petition for judicial review is filed. Rather, "[w]hen a petition for judicial review is filed with the appropriate court, the court has jurisdiction over the case and shall determine whether the filing operates as a stay of the order or action from which the appeal is taken." Ins. § 2–215(f).[4] Of course, in this case Berkshire did not wait for the circuit court to make this decision on its own motion but filed a separate motion to stay. In any event, it is within the court's discretion to determine whether the Commissioner's order should be stayed.

At the July 5, 2000 hearing on the motion to stay, the court made the following ruling:

THE COURT: I—as I indicated previously, do not agree [with] the Maryland Insurance Administration's contention that there is actually a test to determine a stay, I think that a stay is in fact, in the discretion of the Court and while I don't intend to use the 4 elements of injunctive relief,[5] I do

**4.** This statute expressly applies to claims under the Unfair Claim Settlement Practices statutes, Ins. § 27–301 *et seq.* Ins. § 27–306.

**5.** MIA had argued that the court should use the four factors set out for guidance in granting a preliminary injunction to decide whether to

think that it is appropriate to look at them as guides since injunctive relief is somewhat similar to a stay. This is on the Baltimore City's fast track, which means that this case will be resolved quickly and I'm satisfied that when you weigh the injury to Mr. Rosenstein against the injury to Berkshire that Mr. Rosenstein wins on that point and that the public interest is better served by this case going forward. So therefore, I'm going to deny the request to stay the order of judgment at this time. But I will do whatever I can to get this case in as quickly as possible, but not prematurely.

[BERKSHIRE'S ATTORNEY]: Are you going—I take [it] Mr. Rosenstein has offered to post bond.

THE COURT: I'm not.

[BERKSHIRE'S ATTORNEY]: We urge the Court to do that.

THE COURT: Well, it was not my intention, but I'll hear you if you want me to consider it.

[BERKSHIRE'S ATTORNEY]: I think it's an offer that's been made and I think Mr. Rosenstein's attorney didn't get up here and say that he is financially strapped and unable to survive without payment of this judgment, I think then he should be required to post the bond in the event that—to protect the insurance company's interests.

THE COURT: Well, as far as this Court is concerned, this is a case between the Maryland Insurance Commission and Berkshire Life Insurance, not Mr.—I allowed him to enter into this case for the sole purpose of arguing the motion to stay and feel that it is inappropriate. Now, it doesn't mean that if you win this case, you can't use the full force of the Court to go after Mr. Rosenstein. But, I'm not going to require him to post a bond. Counsel, thank you very much. I'll sign an order today to the effect that the motion to stay is denied and granting [Mr. Rosenstein's]

grant the stay. *See Fogle v. H & G Restaurant Inc.*, 337 Md. 441, 455–56, 654 A.2d 449 (1995).

motion to intervene for the limited purposes of arguing the motion to stay.

■ It is clear that, although the court used the four preliminary injunction factors as a guide in exercising its discretion, it was not considering injunctive relief. Rather, the court was exercising the discretion provided to it by Ins. § 2–215(f) by not staying the Commissioner's order. Such an order is not appealable, as the Court of Appeals has explained:

The circuit court's order of March 18, 1996, simply denying a motion to stay the administrative decision and order, was in no sense an "injunction" as contended by the [Maryland] Commission [on Human Relations]. It was not a court "order mandating or prohibiting a specified act," and thus did not amount to an "injunction" as defined by Maryland law. Although the March 18th denial of the motion for a stay left the earlier administrative decision operative, to the same extent as it was operative when rendered by the Commission, nothing in the *court's* order of March 18th required or prohibited any party from doing anything. To whatever extent, if any, immediate action was then required, such requirement resulted entirely from the Commission's order and not the court's order. No party could have been held in contempt for violating the March 18th court order.

Moreover, we have held "that a trial court's decision on a motion for a . . . stay is ordinarily not appealable" as a grant or denial of an injunction, *County Comm'rs v. Schrodel*, 320 Md. 202, 213, 577 A.2d 39, 45 (1990). *See, e.g., Highfield Water Co. v. Wash. Co. San.*, 295 Md. 410, 416–417, 456 A.2d 371, 374 (1983) (stay or refusal to stay proceedings in the same matter ordinarily does not constitute the grant or denial of an injunction), and cases there cited; *Waters v. Smith*, 277 Md. 189, 195–197, 352 A.2d 793, 796–798 (1976).

*LOOC, Inc. v. Kohli,* 347 Md. 258, 265–66, 701 A.2d 92 (1997)(footnote omitted; emphasis in original).

The July 5th order denying a stay was not an order granting or denying an injunction, and Berkshire could not

have appealed that order pursuant to Md.Code (1974, 1998 Repl.Vol.), §§ 12–303(3)(i) of the Courts and Judicial Proceedings Article.

## II. Appeal No. 1935, September Term, 2000

Berkshire next argues that the Commissioner erred in ordering it to pay restitution. Specifically, Berkshire contends that the Commissioner applied the wrong standard of review in the case. It also argues that, in any event, there was sufficient evidence in the record for the Commissioner to adopt the ALJ's determinations, and that there was insufficient evidence in the record for MIA to be able to carry its burden of proof.

### A. Standard of Review Used by Commissioner

Berkshire first argues that the Commissioner failed to use the appropriate standard of review by failing to review the ALJ's proposed decision using the substantial evidence test, as Berkshire contends is required by the applicable regulations. Therefore, "[t]he threshold question in this appeal concerns not what standard of review the courts apply, but, rather, what is the standard of review that the final agency decision maker in this case must apply in reviewing the intermediate decision of the intermediate administrative decision of the ALJ." *Kohli v. LOOC, Inc.*, 103 Md.App. 694, 711, 654 A.2d 922 (1995), *reversed in part and remanded by* 347 Md. 258, 701 A.2d 92 (1997). At oral argument, Berkshire suggested that we did not need to reach this issue. We disagree. If the Commissioner used the incorrect standard of review, we would be constrained to reverse the case without reaching the merits of Berkshire's claims. Thus, we will address this aspect of Berkshire's argument.

■ "In Maryland, administrative agencies are authorized to fashion their own rules by virtue of express or implied legislative delegations." *Kohli*, 103 Md.App. at 711, 654 A.2d 922 (citing *Department of Natural Resources v. Linchester Sand & Gravel Corp.*, 274 Md. 211, 218, 334 A.2d 514 (1975)). The Commission's ability to promulgate its own procedural

rules is derived from Md.Code (1984, 1995 Repl.Vol.), § 10–206(b) of the State Government Article ("SG"), Administrative Procedures Act [6] ("APA"), which states that "[e]ach agency may adopt regulations to govern procedures under this subtitle and practice before the agency in contested cases." In addition, APA § 10–205(a) allows agencies to delegate hearings in contested cases to the OAH.

When the OAH hears a contested case, it is directed by statute to "prepare proposed findings of fact, conclusions of law, or orders in accordance with the agency's delegation under § 10–205." APA § 10–220(a). The agency then takes action on the proposed decision within sixty days. APA § 10–220(c)(1). If the OAH "conducted the hearing and the agency's proposed decision includes any changes, modifications, or amendments to the [OAH's] proposed findings, conclusions, or orders, [its order shall] contain an explanation of the reasons for each change, modification, or amendment." APA § 10–220(d)(4).

█ "When [the agency] delegates the hearing responsibility to an ALJ, the ALJ becomes an extension of [the agency]. Any responsibilities not expressly given the ALJ remain with [the agency] and, unless statutorily proscribed, [the agency] reserves the right to review any aspect of an ALJ decision." *Bragunier v. Masonry Contractors v. Maryland Comm'r of Labor & Indus.*, 111 Md.App. 698, 707, 684 A.2d 6 (1996). MIA has enacted regulations allowing the Commissioner to delegate hearings to the OAH, as it did in this case. COMAR 31.02.02.01(B).

After an ALJ hears a case involving MIA, the ALJ is to submit a proposed decision to the Commissioner containing: "(1) [p]roposed findings of fact; (2)[p]roposed conclusions of law; and (3)[a] proposed order." COMAR § 31.02.02.08(A). The parties may then file exceptions to the ALJ's proposed order. COMAR § 31.02.02.10.

---

**6.** SG § 10–101 *et seq.*

Whether or not the parties file exceptions, the Commissioner is given the case for a final decision:

A. Issuance. After consideration of the administrative law judge's proposed decision, and any exceptions filed by the parties, the Commissioner shall issue a final order or a remand order.

B. Effect of Findings of Fact, Proposed Conclusions of Law, and Proposed Order. In reviewing the administrative law judge's proposed decision, the Commissioner is:

(1) Bound by the findings of fact that are supported by competent, material, and substantial evidence; and

(2) Not bound by any legal analysis, proposed conclusions of law, or proposed order.

C. Types of Action by the Commissioner. The Commissioner may affirm, reverse, or modify the proposed decision or remand the case to the Office for further proceedings by setting forth, with particularity, the basis for the Commissioner's reversal, modification, or remand of the proposed decision.

COMAR § 31.02.02.12.

Berkshire argues that COMAR 31.02.02.12(B), binding the Commissioner to any factual findings made by the ALJ that are supported by "competent, material and substantial evidence," requires the Commissioner to review the ALJ's findings under the substantial evidence test. Berkshire then points out that the "Commissioner, in his Final Order, expressly ruled that he was not required to employ the substantial evidence test in reviewing the Recommended Decision of the ALJ." Berkshire argues that this was reversible error.

The Commissioner explained why he was not using the "substantial evidence" test and how he was evaluating the ALJ's factual determinations:

Indeed, to use the APA "substantial evidence test" in the context of the Commissioner's review of the ALJ's factual findings would flout the test's very purpose. When reviewing an agency's factual findings, courts defer to "the expertise of those persons who constitute the administrative

agency from which the appeal was taken." *Travers v. Balt. Police Dept.,* 115 Md.App. 395, 421, 693 A.2d 378 (1997). The APA permits an agency, in adjudicating a complaint, to rely on "its experience, technical competence, and specialized knowledge in the evaluation of evidence." Md.Code Ann., State Gov't § 10-213(i). Accordingly, in applying the substantial evidence test, the reviewing court does not "substitute its expertise for that of the agency." *State Admin. Bd. of Election Laws v. Billhimer,* 314 Md. 46, 58, 548 A.2d 819 (1988).

The Commissioner then made the following ruling:

COMAR 31.02.02.12B should be construed based on the "ordinary and common meaning" meaning [sic] of the words "competent, material, and substantial." *See Gordon Family Part. v. Gar On Jer,* 348 Md. 129, 137–38, 702 A.2d 753 (1997). For legal purposes, the word "competent" means "legally fit or qualified." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY, p. 290 (1984) ("WEBSTER'S at ———"). The word "material" means "relevant, or of importance to a case." WEBSTER'S at 732. The word "substantial" means either "of considerable importance" or "of considerable amount, *i.e. ample.*["] WEBSTER'S at 1155. Because accepting the former definition would improperly make the word "material" surplusage, the later definition best indicates that the word "substantial" means "ample" in this context.

Accordingly, the Commissioner is not bound by an ALJ's factual findings unless the evidence supporting those findings is legally appropriate, relevant and ample. Because the term "substantial" is meaningful only when put into the context of the total quantum of evidence adduced at the hearing, the Commissioner will not be bound by an ALJ's factual findings unless it is supported by substantial evidence in relation to all of the evidence adduced at the hearing. If, then, there is ample evidence supporting both parties and the ALJ has *properly* considered *all* of the evidence, the Commissioner will be bound by the ALJ's findings of fact and will not reweigh the facts to come to a different conclusion. As well, so long as *"credibility"* is

synonymous with witness *demeanor,* and the oral testimony of witnesses is conflicting about a fact to be found, the Commissioner will give special deference to the ALJ's finding about a witness's credibility. *See Dept. of Health and Mental Hyg. v. Shrieves,* 100 Md.App. 283, 298–302, 641 A.2d 899 (1994). The Commissioner will not give such special deference, however, when an ALJ mislabels as a "finding of fact" a legal conclusion or a finding based on the application of law to fact-especially where that law involves insurance. Also, the Commissioner will not give such special deference when an ALJ, under the appearance of evaluating witness "credibility," is simply concluding that one party made the more persuasive argument. *Id.* Finally, when required to fairly evaluate all of the evidence, the Commissioner may always find material and relevant facts additional to those found by the ALJ, if those facts are essentially uncontroverted and, thus, do not expressly conflict with the ALJ's other factual findings. This is because, if the ALJ's legal analysis was faulty, then the ALJ would not have known that these additional facts were material. [Emphasis in original.]

This Court has found that if an agency establishes a standard under which it reviews an ALJ's proposed decision, it must apply that standard. *Kohli,* 103 Md.App. at 711–13, 654 A.2d 922. *Kohli* involved a decision of the Maryland Commission on Human Relations ("MCHR") reversing an ALJ's decision. The MCHR regulation in force at the time provided that "the Appeal Board may affirm, reverse, or modify the administrative law judge's decision in accordance with the standards as set forth in" APA § 10–222(g). COMAR § 14.03.01.019(F)(1) (1994). The pertinent statutory provision reads as follows:

(h) *Decision.*—In a proceeding under this section, the court may:

(1) remand the case for further proceedings;

(2) affirm the final decision; or

(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision:

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the final decision maker;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

(vi) is arbitrary or capricious.

APA § 10–222(h) (1994). The test set out in § 10–222(h) is the substantial evidence test. The Court of Appeals has clarified the test in a recent case:

A court's role in reviewing an administrative agency adjudicatory decision is narrow; it 'is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.'

In applying the substantial evidence test, a reviewing court decides ' " 'whether a reasoning mind reasonably could have reached the factual conclusion the agency reached.' " ' A reviewing court should defer to the agency's fact-finding and drawing of inferences if they are supported by the record. A reviewing court ' "must review the agency's decision in the light most favorable to it; . . . the agency's decision is prima facie correct and presumed valid, and . . . it is the agency's province to resolve conflicting evidence" and to draw inferences from that evidence.'

Despite some unfortunate language that has crept into a few of our opinions, a court's task on review is *not* to " ' "substitute its judgment for the expertise of those persons who constitute the administrative agency," ' " Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation

and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts. Furthermore, the expertise of the agency in its own field should be respected.

*Marzullo v. Kahl,* 366 Md. 158, 171–72, 783 A.2d 169 (2001) (citing APA § 10–222) (other citations omitted). *See also Ward v. Dep't Pub. Safety & Correctional Servs.,* 339 Md. 343, 347, 663 A.2d 66 (1995); *Maryland Racing Comm'n v. Belotti,* 130 Md.App. 23, 36–37, 744 A.2d 558 (1999).

■ This Court held that because "the Commission has elected to bind its Appeal Board, in cases involving discriminatory employment practices, to those same standards [as used by the courts] in reviewing the ALJ's decision in the instant case," it was required to use those standards in reviewing the ALJ's decision. *Kohli,* 103 Md.App. at 713, 654 A.2d 922. This suggests that, if it wishes, an agency may provide a different standard of review of the ALJ's decision than the test set out in § 10–222(h). The provisions of § 10–222(h) are clearly limited to judicial review by circuit courts, and, because the General Assembly did not require the individual agencies to use this standard, we assume it intended to allow administrative agencies to establish their own internal standards of review.

We have conducted a review of all of the titles of COMAR to determine the standards of review of ALJ decisions currently in use by the various agencies. A number of agencies have no stated standard of review: the Attorney General's Office, the Comptroller, the Department of Housing and Community Development, the Department of Human Resources, the Department of Natural Resources, the Department of Licensing and Regulation, the Department of Transportation, the Higher Education Commission, the Human Relations Commission, State Procurement, the Department of Business and Economic Development, Maryland Institute for Emergency Medical Services, and the Department of Aging. Three agencies have specifically bound themselves to the substantial evidence test set forth in APA § 10–222 with respect to their review of

factual findings: the Retirement and Pension System, the Department of Public Works, and the State Treasurer's Office.

In addition to the Maryland Insurance Administration, the Department of Health and Mental Hygiene ("DHMH"), the Department of Juvenile Justice, and the Department of the Environment all provide for different standards of review for reviewing ALJ decisions.

The DHMH regulation provides:

A. The Secretary is not bound by the hearing examiner's recommendation even in those cases where no exceptions are filed.

B. If no exceptions have been filed and, after reviewing a proposed decision by a hearing examiner, the Secretary concludes that the Secretary is unable to approve that decision as written, the Secretary shall notify all parties and invite argument from the affected parties on the issues the Secretary is reconsidering.

COMAR § 10.01.03.34.

The Department of Juvenile Justice has promulgated a very similarly worded regulation:

A. The Secretary is not bound by an administrative law judge's recommendation even in cases where exceptions are not filed.

B. If exceptions have not been filed and, after reviewing a proposed decision by an administrative law judge, the Secretary concludes that the Secretary is unable to approve that decision as written, the Secretary shall notify all parties and invite arguments from the affected parties on the issues the Secretary is reconsidering.

COMAR § 16.01.01.29.

The Department of the Environment has also promulgated regulations allowing the final decision maker wide latitude in deciding whether to accept the hearing examiner's findings and recommendations:

A. The final decision maker is not bound by the hearing examiner's proposed decision even in those cases when exceptions are not filed.

B. If exceptions have not been filed and, after reviewing a proposed decision by a hearing examiner, the final decision maker concludes that he or she is unable to approve that decision as written, the final decision maker shall notify all parties and invite argument from the affected parties on the issues the final decision maker is reconsidering.

COMAR § 26.01.02.34.

Different agencies have therefore made different decisions on how much deference to provide to ALJ proposed opinions. We will uphold an agency's decision so long as it has properly applied its own standard of review. In this case, therefore, we uphold the Commissioner's decision as to how he would review the ALJ's proposed decision.[7]

We now turn to our own review of the Commissioner's decision, which we, of course, review pursuant to § 10–222(h) and the standards set forth therein. Our discussion will, however, necessarily contain an evaluation of whether he conducted his review in conformance with COMAR § 31.02.02.12.

### B. Was the Commissioner's Decision Supported by Substantial Evidence?

 As indicated *supra*, we review the Commissioner's decision, not the decision of the ALJ.

Ordinarily, a final order of the Commissioner must be upheld on judicial review if it is legally correct and reasonably supported by the evidentiary record. This standard of

---

7. We note that the Commissioner's explanation of the standard of review is similar to the substantial evidence test as set forth above. The Commissioner suggested he would be reviewing the facts through the lens of an insurance expert, which would actually make the standard of review somewhat stricter, since *Marzullo* requires review from the point of view of the "reasonable person." In addition, the Commissioner explicitly stated that he would be reviewing the ALJ's findings in the context of the entire record.

review is both narrow and expansive. It is narrow to the extent that reviewing courts, out of deference to agency expertise, are required to affirm an agency's findings of fact, as well as its application of law to those facts, if reasonably supported by the administrative record, viewed as a whole. The standard is equally broad to the extent that reviewing courts are under no constraint to affirm an agency decision premised solely upon an erroneous conclusion of law.

*Ins. Comm'r v. Engelman,* 345 Md. 402, 411, 692 A.2d 474 (1997) (citations omitted).

"The court's task on review is *not* to ' "substitute its judgment for the expertise of those persons who constitute the administrative agency[.]" ' A reviewing 'Court may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency.' A court's role is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law."

*United Parcel Serv., Inc. v. People's Counsel for Baltimore County,* 336 Md. 569, 576–77, 650 A.2d 226, 230 (1994) (citations omitted).

Prior to engaging in a discussion of specific points Berkshire has raised in its argument, we find it useful to review the accusation against Berkshire, the available remedy, and the remedy now sought. MIA has contended that Berkshire violated Ins. § 27–303(2):

It is an unfair claim settlement practice and a violation of this subtitle for an insurer or nonprofit health service plan to:

* * *

(2) refuse to pay a claim for an arbitrary or capricious reason based on all available information;

If an insurer is found to have engaged in unfair claim settlement practices, it is subject to the following penalties:

(a) For violation of §§ 27–303.—The Commissioner may impose a penalty not exceeding $2,500 for each violation of §§ 27–303 of this subtitle or a regulation adopted under §§ 27–303 of this subtitle.

\* \* \*

(c) Restitution.—

(1) On finding a violation of this subtitle, the Commissioner may require an insurer or nonprofit health service plan to make restitution to each claimant who has suffered actual economic damage because of the violation.

(2) Restitution may not exceed the amount of actual economic damage sustained, subject to the limits of any applicable policy.

Ins. § 27–305.

Berkshire makes numerous charges that the Commissioner adopted erroneous facts and points to a variety of places in his Order. On a fundamental level, however, the major difference between the ALJ's proposed opinion and the Commissioner's Order is that the ALJ found that Berkshire did not arbitrarily and capriciously refuse to pay Mr. Rosenstein's claim for disability for the period March 1997 through October 1997. At oral argument, Berkshire asked that we reverse the Commissioner with instructions to adopt the ALJ's proposed decision. Because the proposed decision and the Order differed in the manner referenced above, we will address each difference in turn.

### 1. The March 1997 through October 1997 Period

The most significant difference between the ALJ's proposed decision and the Commissioner's Order was the findings and conclusions concerning the period from March 1997 through October 1997. The ALJ found that the "application filed by [Mr. Rosenstein] for that period requested residual (partial) disability benefits, not total disability benefits." In April and May of 1997, the ALJ noted, Mr. Rosenstein advised Berkshire that he still took "small and medium" cases. In addition, the ALJ found the medical evidence available to Berkshire at

this time to contain "unclear information" and to "conflict with [Mr. Rosenstein's] request for partial disability benefits." Consequently, the ALJ found that Berkshire's denial of Mr. Rosenstein's claim for this period of time was not arbitrary and capricious.

The ALJ did find Berkshire's decision to terminate review of Mr. Rosenstein's claim for the period November 1997 through July 1998 to have been arbitrary and capricious. The ALJ based this conclusion on the following factual finding: "On March 20, 1997, [Mr. Rosenstein] filed a claim with [Berkshire] for partial disability benefits. He reported on the claim form that he had been partially disabled since the middle of 1996."

The Commissioner rejected this finding of fact, and pointed out errors in law made by the ALJ. Berkshire argues that the Commissioner improperly created a new rule in this case, which resulted in an *ex post facto* law.

### a. Factual Finding

Finding of Fact No. 11 reads as follows: "On March 20, 1997, [Mr. Rosenstein] filed a claim with [Berkshire] for partial disability benefits. He reported on the claim form that he had been partially disabled since the middle of 1996." The Commissioner explained his reason for rejecting this finding:

I find that the ALJ erred in concluding that Mr. Rosenstein filed an application for "partial disability benefits" and thus reject Finding of Fact No. 11. Instead, I find that Mr. Rosenstein's March 20, 1997 Disability Claimant's Statement (the "**March 20 Statement**") contained claims for *both* total disability and residual disability benefits. As did the ALJ, I based my finding on the contents of documents filed by (or on behalf of) Mr. Rosenstein with Berkshire rather than relying upon testimony at the hearing which sought, in hindsight, to define Mr. Rosenstein's intentions. In its Response, Berkshire concurs with this approach.

I base my conclusion on three factors. First, I find as a matter of law that the March 20 Statement form itself is so

ambiguous as to be meaningless and unlawfully deceptive in this particular context. The form requests from the insured information about *"partial* disability," a term neither defined nor apparently used *anywhere* in the policies at issue. In other words, despite being asked by Berkshire to state whether he was "partially disabled," Mr. Rosenstein was not provided coverage by Berkshire for "partial disability" under any of the three policies. Consequently, Berkshire would not provide any benefits to Mr. Rosenstein for being "partially" disabled. Additionally, and as shall be discussed later, "total" rather than "partial" disability is required even to obtain benefits for "residual disability".[fn] Also, I note that Berkshire, in its July 14, 1997 written response to Mr. Rosenstein for a determination, uses only the term "residual disability" but appropriately does not mention "partial disability."

Second, the ALJ improperly did not consider the entire document. It is true that the March 20 Statement contains a box filled in by Mr. Rosenstein which, under the heading "Period of Disability," states, in pre-printed matter, that "I was totally disabled ... From" and that Mr. Rosenstein filled in the dates "Mid 1996 to Present." It is also true that Mr. Rosenstein did not check the box that stated "I was totally disabled ... From[.]"

In that same "Period Of Disability" box, however, Mr. Rosenstein typed in "None" in response to the pre-printed question, "If you have *not* returned in *any capacity* to the business listed in Section 1, list here the name and address of any other business where you have performed any duties.["] In a word, Mr. Rosenstein had stated that he was "totally" rather than "partially" disabled. Additionally, Mr. Rosenstein had listed all three Policy numbers at the top of the March 20 Statement. If Mr. Rosenstein had intended to file a claim only for residual disability benefits, he would have only referenced the policy number for the 1980 Policy.

Third and finally, this finding can only be based on substantial evidence when it is considered along with the "Attending Physician Statement" prepared by Dr. Diener

on the same date as the March 20 Application and received by Berkshire within a few days thereafter. As the ALJ found, "Dr. Diener reported that Mr. Rosenstein has been partially *and* totally disabled since December 1996." Accordingly, and at a minimum, when it received the March 20 Statement and Dr. Diener's March 20, 1997 "Attending Physician Statement," Berkshire was on notice that Mr. Rosenstein had filed a claim for benefits based on "total disability" under all three (3) Policies.

---

<sup>fn</sup> In fact, it appears that Berkshire explains the term "partial disability" only in the "Attending Physician's Statement," which reads: ["]Patient was partially disabled *(able to perform any part of his or her job)* . . . From —— Through ——." This Attending Physician's Statement, however, is not provided when the policy is issued.

[Emphasis in original; citations to the record omitted.]

The Commissioner specifically declined to rely on testimony given at the hearing because the testimony attempted "in hindsight, to define Mr. Rosenstein's intentions," which eliminated the need for the credibility assessments the ALJ seemed to have engaged in with respect to Mr. Rosenstein's conversations with various Berkshire representatives. Rather, the Commissioner looked only to the claim forms filed on March 20, 1997. As the Commissioner pointed out, the claim form listed all three policies. Although none of these policies covered partial disability, Berkshire sent forms covering both total and partial disability without, apparently, sending a cover letter explaining policy coverage.

It is true that Mr. Rosenstein filled the form out claiming "partial disability," but, at the same time, he indicated that he had not returned to work since mid 1996. Moreover, Dr. Diener indicated on the Attending Physician's Statement that Mr. Rosenstein was "totally and partially disabled" beginning on March 20, 1997, when he filled in the claim form.

In addition to the foregoing factors noted by the Commissioner, the ALJ stated that Mr. Rosenstein filed an application for "residual (partial) disability payments." Equating "partial" disability payments with "residual" disability payments

was, in light of the policies, incorrect. Pursuant to the terms of the 1980 Policy, the only policy covering residual disability, residual disability payments are made after a period of total disability, again defined as a failure to engage in one's **own** occupation, has ended. Of course, Mr. Rosenstein filed a claim under all three policies, none of which provides coverage for "partial disability."

 We conclude that the Commissioner applied the proper standard of review in this instance. He provided ample reasons why the ALJ's findings of fact were unsupported by "legally appropriate, relevant, and ample" evidence. In conducting our own review pursuant to the substantial evidence test, we believe that a reasonable person could, after reviewing the record, easily agree with the Commissioner that Mr. Rosenstein had filed an application for "total disability."

### b. Conclusion of Law

The next problem the Commissioner found, which flows from the ALJ's conclusion that Mr. Rosenstein filed a claim for partial disability that was then pending from March 1997, through October 1997 was that it misconstrued the law. Specifically, the Commissioner found that the ALJ failed to consider the following factors in determining whether Berkshire acted arbitrarily and capriciously: (1) liberal construction of whether an insured is disabled under the "own occupation" policies at issue in this case, (2) the requirement that Berkshire act in good faith, and (3) the estoppel created by Berkshire's payment of residual disability benefits under the 1980 Policy despite the language in the policy that required total disability prior to a finding of residual disability. We discuss each of these in turn.

### i. Disability and "Own Occupation" Policies

With respect to the first of the ALJ's errors, the Commissioner stated:

In Maryland, whether an insured is disabled is construed liberally. To qualify for benefits under "own occupation"

disability insurance policies, such as those at issue here, the insured's disability "need only be such as to render him unable to perform the substantial and material acts of his own occupation in the usual or customary way." *Mass. Cas. Ins. Co. v. Rief,* 227 Md. 324, 328 [, 176 A.2d 777] (1962).

All three of Mr. Rosenstein's policies contain the language indicative of "own occupation" disability insurance policies. *See Rief,* 227 Md. at 326, 176 A.2d 777 ("total disability" defined as "inability to engage in any part of the duties of the Insured's regular occupation"). *See also Radkowsky v. Provident Life & Accident Ins. Co.,* 196 Ariz. 110, 112, 993 P.2d 1074 (1999) (where the insured's policies provided that "the insured be unable to perform the substantial and material duties of his 'Regular Occupation' or 'your occupation[,]' " which is defined as ' "your occupation at the time Total Disability begins' " or ' "the occupation . . . in which you are regularly engaged at the time you become disabled.' "); *Berkshire Life Ins. Co. v. Adelberg,* 698 So.2d 828, 829–30 (Fla. 1997) (where policy stated that "[t]otal disability means your inability to engage in your occupation," but did not define "your occupation," the language was held to have "the meaning that an average buyer of an insurance policy would give to the term.")

 As the Commissioner stated, for an insured to collect under an "own occupation" policy, his disability "need only be such as to render him unable to perform the substantial and material acts of his own occupation in the usual or customary way." *Rief,* 227 Md. at 328, 176 A.2d 777. This is a more narrow standard than disability to engage in "any occupation." As we are required to do, we defer to the Commissioner's expertise and the importance of these issues in determining whether an insurance company has acted arbitrarily and capriciously. Consequently, we affirm his decision that the ALJ erred in not taking the more narrow standard into consideration when assessing whether Berkshire acted arbitrarily and capriciously.

### ii. Good Faith

The Commissioner had the following to say concerning the requirement of insurance companies to act in good faith while reviewing claims:

Also, as with all types of contracts, under Maryland law, a condition implied by insurance contracts is that an insurer must "act in good faith when investigating ... or settling claims." *Port East Transfer, Inc. v. Liberty Mutual Ins. Co.*, 330 Md. 376, 382, 624 A.2d 520 (1993). As well, good faith "requires of an insurance company frank and open dealings with the assured[.]" *President & Dir's, of the Firemen's Ins. Co. v. Floss*, 67 Md. 403, 10 A. 139, 143 (1887); *Empire State Ins. Co. v. Guerriero*, 193 Md. 506, 519, 69 A.2d 259 (1949). Because it is "difficult to state precisely how an insurer must weigh each piece of information concerning how an accident occurred," the Commissioner has not established minimum requirements for a "good faith investigation." *Gabler, supra*. Nonetheless, pursuant to § 27–303(2), the Commissioner has held as a matter of law that, in its investigation, *"an insurer may not arbitrarily or capriciously discard or ignore particular "information" favorable to the insured when making a claim determination." Gabler, supra*, (italics in original).

In the instant case, I find that Berkshire arbitrarily and capriciously refused to pay Mr. Rosenstein's claim for total disability because Berkshire had no lawful principle upon which to base its determination. Additionally, Berkshire either unlawfully ignored "all" of the evidence or unlawfully failed to obtain material evidence as a consequence of Berkshire's failure to investigate Mr. Rosenstein's claim in good faith.

It is agreed that, in February 1997, Mr. Rosenstein requested, and Berkshire timely provided, claims forms for the three Policies at issue. Berkshire instructed Mr. Rosenstein to wait until after his disability had extended beyond the two month waiting period before having his physician complete the "Attending Physician's Statement." Since Mr. Rosenstein's last working day was January 10, he

did not file his claim until March 20, 1997, a few more days than was required by the waiting period.

Since that date, Berkshire was on notice to investigate in good faith the nature of Mr. Rosenstein's claim and to respond "frankly and openly" to Mr. Rosenstein. Both Mr. Rosenstein's March 20 Statement and the "Attending Physician's Statement" referenced "total" as well as "partial" disability. In fact, Dr. Diener's March 20, 1997 Statement stated that Mr. Rosenstein was "continuously totally disabled (unable to work)" from "12/96 through on going." Especially because Berkshire contended at the hearing that no one can be "totally disabled" and "partially disabled" at the same time, Berkshire could not have properly handled this claim if it did not acknowledge, and then investigate, the exact nature and parameters of Mr. Rosenstein's claim.

■ Again, we defer to the Commissioner's expertise in this area, and we affirm his decision that the ALJ erred by failing to consider whether Berkshire acted in good faith.

### iii. Payment of Residual Disability

Finally, the Commissioner noted that, by paying Mr. Rosenstein under the residual disability clause of the 1980 Policy without qualification, Berkshire effectively admitted that Mr. Rosenstein was or had been totally disabled:

Indeed, Berkshire is estopped from denying that it considered Mr. Rosenstein as suffering from a "total disability." On behalf of Berkshire, Mr. Yeager testified unequivocally that, as of July 14, 1997, Berkshire paid "residual disability benefits" to Mr. Rosenstein with coverage commencing February 15, 1997. Under the terms of the 1980 Policy, Berkshire agreed to pay a residual monthly indemnity if "*all* of these [eight] conditions are met: (1) you [the insured] enter a period of such disability right after the end of a *period of total disability;* (2) the residual and the total disability *both* resulted from *the same cause* or a related cause; [and] (3) the *total disability* was continuous for the qualification period."

Berkshire's testimony to the contrary makes no sense and, thus, lacks any credibility. Mr. Yeager testified that "it was Berkshire Life's position that Mr. Rosenstein was *never totally disabled* [and] that he never established loss of income." Yet, Berkshire found Mr. Rosenstein eligible for "$3,000" of residual disability benefits because Berkshire "liberally interpreted the [residual disability] rider in order to *maximize* any benefit that we could make available to Mr. Rosenstein." Although Mr. Yeager denied that this was a "favor," he agreed that it was done "as an *exception* in order to try to be responsive to Mr. Rosenstein." Because the policy language makes no provision for such an "exception," to find that Berkshire paid benefits to Mr. Rosenstein without his having been totally disabled would be tantamount to finding that Berkshire violated its fiduciary duties to its stockholders by paying claims that need not be paid.

I also note that, although the MIA will usually abstain from a dispute arising out of conflicting conclusions from licensed medical providers as to whether a complainant is disabled, in this case, all three medical providers who provided reports *agreed* that Mr. Rosenstein is totally disabled. In other words, there is *no* medical provider—and has *never* been *any medical provider to date*—who has formally concluded that Mr. Rosenstein is *not* "totally disabled." Given the evidence before Berkshire and given the Policies' language, the only logical and sound finding is that Berkshire concluded that Mr. Rosenstein was "totally disabled" as the term was meant within the Policy.

Thus, because *Berkshire* did find Mr. Rosenstein to be totally disabled (as least from February 15, 1997), the remaining question is, by July 1997, whether Berkshire had a lawful basis for concluding that Mr. Rosenstein, although previously totally disabled, had improved by April 1997 such that he could resume some but not all of his "own" work.

I conclude that Berkshire had no proper basis for concluding that Mr. Rosenstein had a residual capacity to work at his "own" occupation. First and foremost, under the

terms of the 1980 Policy, by payment of residual disability benefits to Mr. Rosenstein, Berkshire had concluded that Mr. Rosenstein's "total disability was continuous for the qualification period" for residual disability. Thus, although Berkshire itself had concluded that Mr. Rosenstein could not work at all from February 15, 1997 through April 15, 1997, Berkshire has adduced no evidence to show why Mr. Rosenstein could work part-time at his "own occupation" thereafter. In other words, there is no medical or rehabilitative evidence of residual (rather than total) disability limitations placed upon Mr. Rosenstein. In fact, as noted above, the medical reports submitted during this period— and all of the medical reports submitted thereafter in Mr. Rosenstein's "supplemental" claim—concluded that Mr. Rosenstein was totally disabled and "unable to work." As well, there is no evidence that Berkshire ever *analyzed*, in any objective or understandable manner, the tax returns and other financial data provided by Mr. Rosenstein on two occasions during April 1997.

In short, Berkshire has provided only two reasons for treating Mr. Rosenstein's claim as one of "residual" rather than "total" disability. The first reason is that Berkshire allegedly relied on its interpretation of the March 20 Statement that Mr. Rosenstein's claim was *only* for "partial" disability. Based on the amended findings of fact and the explanation therefor provided earlier in this Order, I have concluded that Berkshire had no proper or lawful basis for its interpretation.

Berkshire's only other reason for paying Mr. Rosenstein "residual" rather than "total" disability benefits is comments purportedly made to Berkshire by Mr. Rosenstein. For the reasons stated below, I find that this reason was also arbitrary and capricious.

There are, essentially, two dates at which these statements were made. In one instance, on April 3, 1997, Mr. Rosenstein's statements were noted in a Berkshire claims log, memorializing a telephone conversation. The contents of that claims log note were summarized by the ALJ in Finding of Fact No. 13. For the reasons noted earlier, I

have accepted as a fact what is noted by the ALJ. I believe, however, that it is important to look at exactly what Berkshire memorialized.

Even in these notes, Berkshire was clearly put on notice that Mr. Rosenstein's business had "gone down" (at least partly) due to "his condition." Berkshire was also expressly informed that, as of April 1997, Mr. Rosenstein had not worked *at all* for almost the past three months. In this context, then, it would be unclear whether Mr. Rosenstein meant that he either would take "small" and "medium" size cases—*if he could*—or if he could take such cases and was in fact actively seeking work. Support for the former construction is provided by Mr. Rosenstein's testimony that he was brought up on the admirable basis that "you worked., as long as you could stand up and breathe." In similar circumstances involving disability claims investigations, other courts have noted that is improper for an insurer to rely "on a casual statement [by the insured] that he was only partially disabled without making appropriate inquiries to determine his real condition." *Ingalls v. Paul Revere Life Ins. Group*, 561 N.W.2d 273, 283–84 (N.D.Sup. Ct.1997); *see also Brown v. Continental Casualty Co.*, 209 Kan. 632, 498 P.2d 26, 33 (1972) (where the court held that the "circumstances made known to [the insurer] by Dr. Kaufman's report were of themselves such as to require more than a simple armchair perusal of the report; we believe they required a good-faith effort to secure additional medical information . . . rather than passive inaction.")

The other statement as to residual capacity to work purportedly occurred during the meeting of May 14, 1997 between Bruce Hodsoll, Berkshire's then Vice–President for Claims Management and Mr. Rosenstein at his home. *See Amended Finding of Fact No. 14.* From Mr. Hodsoll's own Memorandum to this file, however, it is clear that Mr. Rosenstein made a demand for payment for "total disability" benefits under all three policies. As well, and although Mr. Hodsoll believed that Mr. Rosenstein would be unable to prove a loss of income directly related to his alleged disability, Mr. Hodsoll expressly noted that it was Mr.

Rosenstein's position *"that his lack of business was due to his disability."* While Mr. Hodsoll stated that he believed that Berkshire had no liability for *either* "total" or "residual" liability benefits, and that Berkshire's liability "Would be limited to the terms of the contract to [only $3,000]," Mr. Hodsoll nevertheless made a $36,000 settlement offer to Mr. Rosenstein for the surrender of all three (3) Policies. Interestingly, this $36,000 figure represents one year of the cumulative "total disability" benefits for all three (3) policies and far exceeds Berkshire's potential liability under the single 1980 Policy which provided residual disability coverage. Moreover, when Mr. Rosenstein rejected this offer, Mr. Hodsoll agreed to see if there "was any way in which [Berkshire] might increase its offer."

We note that the Commissioner appears to base this opinion, in part, on credibility by stating: "Berkshire's testimony to the contrary makes no sense and, thus, lacks any credibility." The Commissioner specifically stated that "so long as *'credibility'* is synonymous with witness *demeanor,* and the oral testimony of witnesses is conflicting about a fact to be found, the Commissioner will give special deference to the ALJ's finding about a witness's credibility." (Emphasis in original.) The witnesses did not conflict on this point, and, indeed, the ALJ made no credibility findings at all concerning Berkshire's witnesses. The problem the Commissioner had with the ALJ's findings and conclusions was the ALJ's failure to address the dichotomy between the language of the policies and Berkshire's actions, i.e., the issue of estoppel.

The Commissioner cited case law in support of the proposition that Berkshire was obligated to inquire into the exact nature of Mr. Rosenstein's disability claim. Again, as we have stated above, we defer to the Commissioner's expertise and affirm the Commissioner's decision in this regard.

### c. *Ex Post Facto Imposition of Duty Not Imposed by Existing Rules, Regulations, or Law*

Berkshire next contends that "the Final Order re-casts Berkshire Life's conduct as a violation of a duty imposed by

law." Berkshire cites the Commissioner's remarks that Berkshire did not conduct an independent medical review of Mr. Rosenstein's case as well as the following sentence from the Order:

> There is also an additional basis for concluding that it was improper for Berkshire to rely on these statements made by Mr. Rosenstein. **Because different claims may present different circumstances, we hesitate to prescribe in detail the components for all requisite claim investigation undertaken in good faith. I will hold here,** however, that *when the primary basis of an insurer's denial in a first-party claim is based on the alleged statements of an insured made to his or her insurer, then the insurer cannot in good faith rely on those statements until and unless they have been communicated in writing to the insured for verification or emendation.* To illustrate, Mr. Rosenstein's statements here were, by Berkshire's own admission, material to its decision to treat this claim as one for residual disability rather than for total disability. Yet, not until July 14, 1997—and only after Mr. Rosenstein had written a complaint letter to Berkshire's President and, as well, only after the MIA had requested from Berkshire "a full report on this matter"—did Berkshire put in writing its position to Mr. Rosenstein. Promptly upon being notified, Mr. Rosenstein disagreed with Berkshire's interpretation of his remarks and Mr. Rosenstein has consistently maintained that he was and remains unable to work even "small and medium" size, local cases.

[Italics in original; other emphasis supplied.]

 As Berkshire points out, there are no provisions in the Insurance Code, the case law, or the regulations that require insurers to obtain medical opinions or forbids them from basing decisions on interviews with the insured prior to granting or denying an insured's claim for disability. At first blush, the Commissioner's statement appears to require Berkshire to adhere to a standard of behavior not required by law and which could not have been foreseen. Further review of the Commissioner's decision, however, demonstrates that the

Commissioner did not "promulgate" a new rule but instead based his conclusion on the facts of this particular case only. He did so because of Berkshire's own actions in investigating this claim, including the confusion generated by the claim form, and questions raised as to whether Berkshire was reviewing the claim in good faith. In short, the Commissioner held that, under the circumstances of this particular case and with all the information that it had, Berkshire's reliance solely on an interview with Mr. Rosenstein in denying his disability claim pursuant to an "own occupation" policy was arbitrary and capricious.

The Commissioner essentially found that Berkshire acted arbitrarily and capriciously in relying only on Mr. Hodsoll's interview with Mr. Rosenstein in denying the claim. This case involves a judgment on the ability of the insured to engage in his own occupation, which is, as the record demonstrated, dependent on cognitive functioning on a high level. Such disability claims are doubtless quite difficult to assess, and we simply remark that Berkshire, confronted with the medical reports submitted by Mr. Rosenstein's physicians, probably could have saved itself and those involved much time and expense by obtaining an independent medical review of Mr. Rosenstein's case.

Even in the absence of an independent medical review, Berkshire has not disputed the reports of Mr. Rosenstein's medical doctors, either at the administrative hearing or on appeal, except to allege their inadequacy to prove disability. Moreover, Berkshire did little during the claim evaluation process to question the medical bases for Mr. Rosenstein's claim. Instead, Berkshire claims that Mr. Rosenstein's abilities speak for themselves and that he does not appear to be impaired in any way. Berkshire focuses in particular on Mr. Rosenstein's testimony on the day of the hearing.

Mr. Rosenstein's performance on one day, or even two days, if we take his conversation with Mr. Hodsoll into account, is hardly sufficient for anyone to definitively conclude that he is not disabled, particularly with respect to his "own occupation."

The record is replete with letters from Mr. Rosenstein's doctors that he is and has been totally disabled. In addition, our review of the record of the hearing uncovered occasions where Mr. Rosenstein was repetitive or appeared to have problems remembering. In any event, the fact that he is very familiar with his policies and testified, on the whole, with little problem does not mean he is capable of engaging in his "own occupation." This case appears to be far less complicated than the factual and financial transactions that he has traditionally investigated for fraud and other forms of wrongdoing. Consequently, we affirm the Commissioner's findings and conclusions with respect to this issue.

### 2. The ALJ's Remedy

Berkshire next argues that the Commissioner erred by failing to adopt the ALJ's proposed decision to remand the case to Berkshire "for a determination of [Mr. Rosenstein's] eligibility for total disability benefits" for the period July 1997 through July 1998. Again, it is the Commissioner's decision that we review, and he provided the following reasons for rejecting the ALJ's recommended remedy:

> I reject the ALJ's recommendation that Mr. Rosenstein's claim be remanded to Berkshire for it to make a "medical determination" of whether Mr. Rosenstein was "totally disabled" as is meant under the terms of the three disability insurance policies at issue. As was discussed previously, *Berkshire* already made that determination: (a) by paying to Mr. Rosenstein residual disability benefits, for which a finding of "total disability" was a condition precedent; and, (b) because *all* medical evidence in the file to date has supported, and continues to support, a finding of "total disability."

> In its Response, Berkshire critiques the quality of the medical evidence submitted by Mr. Rosenstein. For example, Berkshire contends that Dr. Diener did not support his conclusion of "total disability" with "objective, medically quantifiable symptoms." Berkshire states that there was "nothing remarkable in [Mr. Rosenstein's] bloodwork," and

that Dr. Hyman had not "conducted any neuropsychological testing necessary to medically quantify Mr. Rosenstein's subjective assertions."

Berkshire misses the point. Neither the ALJ nor I have rendered an opinion on the "quality" of the medical evidence. Had Berkshire wanted to challenge Mr. Rosenstein's medical evidence, *Berkshire* could and should have done so. Berkshire, however, failed to do so at all, failed to do so in any timely manner and failed to do so before rendering a determination as to whether Mr. Rosenstein was "totally disabled." Moreover, Berkshire could have but failed to have this claim reviewed by Berkshire's Medical Director. I add that, other than retaining a psychologist such as Dr. Cohen who works solely for insurers, Berkshire has *never* entered into *any* contract with medical doctors to review and help adjudicate disability claims. Moreover, according to Mr. Yeager, in his ten years working for the Berkshire Claims Department, he cannot recall even three (3) times where Berkshire has "ever gone out to get ... medical expertise to assist in reviewing a claim"(!) Thus, it is unlikely that, but for the MIA'S intervention, Berkshire had any intention of securing an independent medical examination for Mr. Rosenstein or of obtaining a medical review of Mr. Rosenstein's medical records.

Overall, Berkshire's actions here represent what may be termed as "artful neglect." Berkshire gives the *appearance* of investigating a claim in order to render a good faith claims determination. As part of this appearance, Berkshire timely requests financial information from its insured and then timely requests more information from its insured. In direct contrast to this "appearance," however, Berkshire does not *analyze* the information at all, much less *use an analysis* in a cogent and rational way to support a proper claims determination. Similarly, as part of this appearance, Berkshire timely obtains medical information. Although Dr. Diener, an internist, stated in his Attending Physician's Statement that he had diagnosed "polyarthritis," Berkshire did not have this information reviewed by a physician. Dr.

Diener subsequently confirmed his diagnosis. After Dr. Hyman provided diagnoses of "major depression, hypertension, esophagitis, inflammatory arthritis, hypercholesterolemia and hiatal hernia," Berkshire sends the report to be reviewed only by a psychologist (Lori Cohen, Ph.D.) rather than to a psychiatrist or other type of medical practitioner. To her credit, Dr. Cohen's reports indicate that she did review the pertinent medical records involved. Not surprisingly, however, since a psychologist is generally not competent to render a determination in medical areas, Dr. Cohen makes no conclusions or recommendations but simply asks for ... more information. Finally, but not without import, throughout the entire claim process, Berkshire generally has responded in writing to Mr. Rosenstein only after he has written to Berkshire or to an agency of the government. [Emphasis in original; citations to the record and footnote omitted.]

■■■■ MIA was the only party who entered medical records into evidence, and all of those medical records contained diagnoses and opinions that Mr. Rosenstein was totally disabled. Berkshire argues that "the medical records do not clearly and irrefutably evince that Mr. Rosenstein was totally disabled." Even if this is true, "clearly and irrefutably" was not the burden of proof in this case. *See Coleman v. Anne Arundel County Police Dep't,* 136 Md.App. 419, 446, 766 A.2d 169 (2001).[8]

The Commissioner explained that a claimant in a case for unfair claim settlement practices, which in this case was MIA,

---

8. In *Coleman*, we set forth the standard burden of proof in administrative cases:

An administrative case is a civil case and, as such, the standard of proof is generally the preponderance of the evidence. *See* Md.Code (1984, 1999 Repl.Vol.), § 10–217 of the State Government Article ("The standard of proof in a contested case shall be the preponderance of the evidence unless the standard of clear and convincing evidence is imposed on the agency by regulation, statute, or constitution.")

has a higher burden than simply a preponderance of the evidence:

> We first define the applicable standard which the ALJ failed to state or discuss. Berkshire is charged with refusing to pay Mr. Rosenstein's claim for total disability benefits "for an arbitrary and capricious reason based on all available information." Ins. Art. § 27–303(2).

The Commissioner has previously construed § 27–303(2) as requiring a licensee insurer to show that it refused to pay the claim at issue based on: (1) an otherwise lawful principle or standard which the insurer applies across the board to all claimants; and (2) reasonable consideration of "all available information." *Gabler v. American Manufacturers,* "Order of Remand" at 6–7, MIA No: 60–7/97 (March 11, 1998). As the Commissioner explained:

> At the outset, I note that all claimants proceeding under Ins. Art. 27–303(2) (formerly Ins.Code § 230A(c)(2)) shoulder a heavier burden than what they would labor under in a civil lawsuit. In a civil lawsuit, whether the plaintiff be a first-party claimant alleging breach of contract or a third-party claimant suing the insured for negligence, the plaintiff need only prove her case by a "preponderance of the evidence."
>
> In contrast, under Ins. Art. § 27–304, a claimant must prove that the insurer acted based on "arbitrary and capricious reasons." The word "arbitrary" means a denial subject to individual judgment or discretion, WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 121 (1984) and made without adequate determination of principle. BLACK'S LAW DICTIONARY 55 (Abridged 5th Ed.1983). The word "capricious" is used to describe a refusal to pay a claim based on an unpredictable whim. WEBSTER'S at 227. Thus, under Ins. Art. § 27–303, an insurer may properly deny a claim if the insurer has an otherwise lawful principle or standard which it applies across the board to all claimants and pursuant to which the insurer has acted reasonably or rationally based on "all available information."

*Id.*

 Although the language used by the Commissioner in the quoted text suggests that he required the claimant to carry a higher burden of proof than a mere preponderance, we do not believe that is the case. We interpret the language of the quoted opinion as acknowledging that it is more difficult to prove that an insurer acted "arbitrarily and capriciously" than that it acted negligently. The claimant must still prove by a preponderance of the evidence that the insurer acted arbitrarily and capriciously.

In this case, the fact remains that, particularly from the period of November 1997 through July 1998, MIA, the claimant in this case, provided uncontested medical evidence from three different doctors that Mr. Rosenstein was totally disabled. Consequently, we agree with the Commissioner that MIA met its burden of proof to show that Mr. Rosenstein was totally disabled, and that Berkshire refused to pay Mr. Rosenstein's claim "for an arbitrary and capricious reason based on all available evidence."

 With respect to the ALJ's remedy, we agree with the Commissioner that "[i]n recommending that Mr. Rosenstein's claim be remanded to Berkshire for additional 'investigation,' the ALJ was acting beyond her statutory authority." Ins. § 27–305 clearly delineates the available remedies for a violation of Ins. § 27–303, and a remand to the insurance company for further investigation is not listed:

(a) For violation of § 27–303.—The Commissioner may impose a penalty not exceeding $2,500 for each violation of §§ 27–303 of this subtitle or a regulation adopted under §§ 27–303 of this subtitle.

\* \* \*

(c) Restitution.—(1) On finding a violation of this subtitle, the Commissioner may require an insurer or nonprofit health service plan to make restitution to each claimant who has suffered actual economic damage because of the violation.

(2) Restitution may not exceed the amount of actual economic damage sustained, subject to the limits of any applicable policy.

Ins. § 27–305.

The scope of appellate review is narrow. To quote the circuit court: "As I said at the outset, I might not have done what the Commissioner did or the Administrative Judge did in the fashion that they did it if I were the person listening to the case. However, that's not the standard under which I am to review this matter." We agree and affirm the Commissioner's findings of fact and conclusions of law.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**