# RAYMOND INTERNATIONAL, INC. v. BALTIMORE COUNTY, MARYLAND ET AL.

[No. 714, September Term, 1979.]

*Decided April 11, 1980.*

The cause was argued before GILBERT, C. J., and THOMPSON and LISS, JJ.

*George W. McManus, Jr.,* and *Kenneth B. Frank* for appellant.

*Harry S. Shapiro, Chief Assistant County Solicitor for Baltimore County,* with whom was *Leonard S. Jacobson, County Solicitor,* on the brief, for appellee Baltimore County, Maryland. *Douglas G. Worrall,* with whom were *Smith, Somerville & Case* on the brief, for appellee Greiner Engineering Sciences, Inc.

LISS, J., delivered the opinion of the Court.

This appeal by appellant, Raymond International, Inc., arises out of a judgment rendered in a non-jury trial in the Circuit Court for Baltimore County in which the presiding judge ruled that Baltimore County, one of the appellees, was indebted to the appellant in the amount of $18,431.98. At the same time, the trial judge entered a verdict for costs in favor of the remaining appellee, J. E. Greiner, Inc. Appellant filed the within appeal from these judgments.

By invitation to bid in May of 1972, Baltimore County solicited bids for underwater repairs to the bascule piers of the Wise Avenue Bridge over Bear Creek. Bidders were supplied with plans and specifications prepared for the County by Greiner. The proposed repairs consisted of the removal of deteriorated concrete from the bases of the piers and the placement of aggregate concrete in lieu of the deteriorated material. The bridge was originally built about thirty years ago. It was of the bascule type with two main piers which encompassed the channel of the river. The piers were of concrete resting on piles driven into the river bottom.

Their reconstruction was contemplated to be accomplished by driving additional piles into the river bottom and encircling the piling with a cofferdam consisting of interlocking sheet piling driven into the bottom of the river and extending out of the water thus forming a boxlike structure. The cofferdam is erected and sealed in order to permit the water to be removed from the interior of the structure. The sealing of the cofferdam is accomplished by placing in its bottom a mass of concrete heavy enough to act as a plug and sufficient to counteract the pressure of the water. The placement of this mass of concrete is achieved by the "tremie" method which requires a tube to be lowered into the water through which concrete flows that settles on the bottom of the cofferdam. Subsequent to this operation, the water in the cofferdam is removed and work on the bridge pier may be completed free of the water. The mass of concrete in the bottom of the cofferdam is known as "tremie concrete," and when construction or repair of the bridge pier is completed, the sheet piling of the cofferdam is removed and the "tremie" is abandoned by being left in place.

Over the years after the original construction of the bridge, Greiner conducted regular inspections of the bridge including the piers. In 1971, Greiner reported deterioration of the bridge piers below the waterline. This deterioration was determined to be of a progressive nature. Based on the data gathered including test borings and inspection by divers, Greiner came to the conclusion that the piers needed immediate repairs. Greiner communicated with Raymond which had some expertise in the making of underwater repairs. Raymond's representatives recommended a repair procedure which contemplated a jacketing of the piers with preplaced aggregate concrete. This procedure is a construction technique used in underwater work by which stones are placed in a form with a cementitious material (grout) pumped into the form displacing the water and forming concrete.

At the request of the County, Greiner prepared contract documents for the recommended repairs in order that the County could solicit bids. The documents included

specifications, drawing, informational drawings, an addenda, an invitation to bid and other general provisions. Bids were solicited from a limited group of bidders who were thought to have the specialized abilities to perform the work. The group included Raymond which ultimately submitted a bid substantially below the bid of the next lowest bidder. Raymond and the County entered into an agreement by the terms of which Raymond was to finish the work in 100 days. Failure to do so made the contractor liable for liquidated damages under the contract. The County promised to obtain for Raymond a necessary right of way. Raymond was to be paid on a unit price basis the approximate sum of $213,000 based on the 230 cubic yard quantity estimated by Greiner and the County to be the amount of aggregate concrete required to complete the job. The work to be performed consisted primarily of cleaning around Piers Nos. 3 and 4 of the bridge, forming and pouring preplaced aggregate concrete around the deteriorated faces of the piers, and making repairs to the submarine cables.

After the repairs began, Raymond contends it discovered that Greiner's specifications were inaccurate. It produced witnesses who stated that: (1) the material surrounding the piers was not soft as represented, but contained large pieces of concrete, pile butts, old timbers and steel; (2) the tremie was irregular with variations up to 1.5 feet; (3) no tremie existed in some areas; (4) only an average of two inches of deteriorated concrete could be chipped away, rather than the six inches represented in the plans and specifications which resulted in the projected total of 230 cubic yards of concrete not being able to be placed; and (5) the tremie was so weak in places that the form could not be anchored. Raymond contended below and contends here that as a result of the inaccuracy of Greiner's specifications it was required to perform unforeseeable increased work. Raymond also complained particularly that instead of the 230 cubic yards of aggregate concrete estimated to be used, it utilized and was paid for only 114 cubic yards. Raymond urges that its unit price as bid was computed by spreading its fixed costs over the 230 cubic yards stated in the plans and

specifications and that the County paid for only 114 yards which deprived Raymond of more than half of its computed contract price. Raymond advised the County in a summary of claim filed on January 30, 1976, that while its original bid was $213,000, as a result of the misrepresentations included in the plans and specifications and the unforeseeable conditions arising out of the misrepresentations, its acutal expenditure to complete the project amounted to $1,095,804.30. This calculation is apparently not disputed. Baltimore County rejected the claim and refused any adjustment in its contract with Raymond.

Suit was then filed by Raymond against Greiner and the County. The declaration was based on alleged fraud, negligent misrepresentation, breach of warranty and breach of contract. Raymond sought compensation for the additional costs incurred as a result of the unforeseen conditions of the piers, the return of liquidated damages retained by the County, and an award for punitive damages. During the course of the bench trial which lasted for many weeks, the trial judge granted Greiner's motion to dismiss at the conclusion of Raymond's case. At the conclusion of the entire case, the court awarded Raymond $900 representing rental payments made by the appellant for rights of way and $17,531 being the compensation withheld by the County which was due Raymond. The appellant, unsatisfied with the judgment of the trial judge, thereupon filed this appeal.

The issues to be decided are:

I. Whether the trial judge erred in holding that the plaintiff was not entitled to rely on the conditions, quantities and representations contained in the contract?

II. Whether the trial court erred in holding that the plaintiff was not entitled to compensation for the unforeseen or misrepresented conditions encountered in the performance of the contract?

III. Whether Greiner's motion to dismiss at the close of Greiner's case was improperly granted?

IV. Whether the County's motion raising preliminary objection was improperly granted on the issue of sovereign immunity?

V. Whether the trial judge erred in denying plaintiff's claim for an equitable adjustment in time and compensation due to a 50.1% underrun in preplaced aggregate?

## I, II, V

One of the principal issues at trial was whether Raymond was justified in relying on the conditions, quantities and representations contained in the contract documents. Baltimore County in its defense relied principally on the contract documents which were filed as exhibits in this case. These documents included the invitation to bid, specifications, the proposal, the agreement, special provisions and various drawings. Included in the contract documents was the following which appeared in Section 5 of the special provisions:

> Original construction data has not been verified by actual field measurements and the conditions observed during the underwater inspections and tests may have changed since the date on which they were made. Therefore, the above described data are furnished to the Contractor for general informational purposes only and do not purport to represent existing field conditions. It shall be the Contractor's sole responsibility to verify by actual field measurements inspections and tests and data which may be of significance to him in the preparation of his bid.

The contract documents specifically stated that: "Special provisions shall govern over specifications, supplemental specifications and plans." The County points out that the invitation to bid at page 1-03 states: "Bidders must examine the drawings and specifications carefully and must make a

personal examination of the location and nature of the proposed work."

In addition, the proposal which was made a part of the contract documents required the bidders to agree as follows:

> The undersigned hereby declare that they have carefully examined the Form of Contract, Specifications, Special Provisions and Drawings forming a part of the same and have to their satisfaction examined the locality of the proposed work and agreed to furnish all labor, tools, materials, machinery, equipment and other means of construction called for in the manner provided in the Contract, Specifications, Special Provisions and Drawings thereto and requirements under them of the Engineer. . . .

Sheet "X" which also was made a part of the contract documents provided:

> Note 2 — contractor to verify all dimensions in field.
>
> Note 5 — dimensions shown taken from as built plans and have not been verified by actual measurement. The contractor shall verify any and all dimensions as may be required to complete satisfactorily all work under this contract.

Relying on these provisions, the County urgently contends that the trial judge was correct when he held that there was no "justifiable reliance" by the appellant on the conditions stated to exist at the Wise Avenue bridge by the County's engineer, Greiner, and that the trial judge committed no error when he held that: "[T]he contract documents that finally formed the contract clearly placed the burden to the Plaintiff to make a reasonable inspection to determine if these conditions were as depicted as in the contract documents."

The legal issue boils down to a question of whether Raymond was required to verify independently the

information upon which it based its bid, or whether Raymond was justified in relying on the information supplied by the County and its engineer as to the plans and specifications for the project.

The seminal case on the subject is *Hollerbach v. United States,* 233 U.S. 165, 34 S. Ct. 553, 58 L. Ed. 898, which was decided by the Supreme Court in 1914. That controversy involved a contract between the appellant Hollerbach and the United States Government for the repair of a dam. In its specifications for the contract, the Government stated that the dam was backed with broken stone and sediment. As the contractor proceeded with the work of removing the material, it was discovered that the backing of the dam was composed of a soft, slushy sediment and that the required excavation of the dam was substantially greater than that stated in the contract documents. The contract contained several exculpatory clauses which were stated as follows:

It is understood and agreed that the quantities given are approximate only, and that no claim shall be made against the United States on account of any excess or deficiency, absolute or relative, in the same. Bidders, or their authorized agents, are expected to examine the maps and drawings in this office, which are open to their inspection, to visit the locality of the work, and to make their own estimates of the facilities and difficulties attending the execution of the proposed contract, including local conditions, uncertainty of weather, and all other contingencies.

\* \* \*

It is expected that each bidder will visit the site of this work, the office of the lockmaster, and the office of the local engineer and ascertain the nature of the work, the general character of the river as to floods and low water, and obtain the information necessary to enable him to make an intelligent proposal. [233 U.S. at 167-68, 34 S. Ct. at 554.]

In spite of the Government's attempt to make the contractor responsible for his own inspection, the investigation of the site and the work to be done under the contract, the Supreme Court held:

> [T]he specifications assured them of the character of the material, a matter concerning which the Government might be presumed to speak with knowledge and authority. We think this positive statement of the specifications must be taken as true and binding upon the Government, and that upon it rather than upon the claimants must fall the loss resulting from such mistaken representations. We think it would be going quite too far to interpret the general language of the other paragraphs as requiring independent investigation of facts which the specifications furnished by the Government as a basis of the contract left in no doubt. If the Government wished to leave the matter open to the independent investigation of the claimants it might easily have omitted the specification as to the character of the filling back of the dam. In its positive assertion of the nature of this much of the work it made a representation upon which the claimants had a right to rely without an investigation to prove its falsity. See *United States v. Stage Co.,* 199 U.S. 414, 424. [233 U.S at 172, 34 S. Ct. at 556.] [1]

Appellant also cites *Robert E. McKee, Inc. v. City of Atlanta,* 414 F. Supp. 957 (N.D. Ga. 1976). In that case, the results of test borings were gratuitously provided to bidders along with specifications and other contract documents. The contract contained a clause in which the owner disclaimed any responsibility for the accuracy of the test results or for any conclusions drawn from them. The contract specifically provided that the test boring data were not to be considered a part of the contract. The contractor sued for

---

1. *See also* United States v. Spearin, 248 U.S. 132, 39 S. Ct. 59, 63 L. Ed. 166 (1918); Christie v. United States, 237 U.S. 234, 35 S. Ct. 565, 59 L. Ed. 933 (1915).

misrepresentation because it discovered the level of rock was substantially higher than had been represented by the test boring.

The District Court in *McKee, supra,* at 959, held that it is clear "the government does not become an insurer merely by providing certain information" to the contractor. That Court, in determining whether the Government was liable for misinformation which it furnished to the bidder, posed two questions which must be examined: (1) "whether the contractor could have discovered the true facts through *reasonable* investigation[?]" and: (2) what "is the materiality of [the] misrepresentation itself [?]" *Id.* at 960.

*Condon-Cunningham v. Day,* 22 Ohio Misc. 71, 258 N.E.2d 264 (1969) involved a suit in which damages were allowed to a highway contractor as a result of misleading soil tests even though the contract provided that the test results were not part of the contract and that the contractors were obliged to make their own inspection. In examining the issue whether the contractor could have discovered the true facts for itself, the Court said:

> What were the bidders to do? Was each bidder to run these tremendously expensive core boring tests not knowing whether or not he would get the contract? Under defendant's contention there would be practically no bidders. A bidder would be faced with this dilemma. Shall I bid on what is presented to be and run the risk of loss if the information is not correct or shall I run core boring tests at great expense, amounting to thousands of dollars, which expense I must bear on my own if I do not secure the contract? [258 N.E.2d at 274-75.]

*See also Michigan Wisconsin Pipeline Co. v. Williams-McWilliams Co. v. United States,* 551 F.2d 945 (5th Cir. 1977); *Foster Construction C. A. & Williams Bros. Co. v. United States,* 435 F.2d 837 (1970); *Alpert v. Commonwealth,* 357 Mass. 306, 258 N.E.2d 755 (1970).

There is one case from the Court of Appeals in which a

similar controversy was addressed. That case is *Linz v. Schuck,* 106 Md. 220, 67 A. 286 (1907), in which a contractor was hired to excavate a cellar under appellant's property. Before submitting a price, the contractor inquired about the nature of the soil whereupon he was taken by the owner to a property across the street from the subject property and shown a cellar which the owner stated had been constructed without any difficulty. When the contractor began the work, however, it was ascertained that the building stood on a three-foot crust of hard ground under which were muddy, swamp-like conditions. It was conceded that the contractor could have ascertained the condition of the earth under the house by digging a test hole. However, the contractor relied on the owner's representations without performing any tests. Suit for additional compensation due to substantial and unforeseen difficulty was brought by the contractor. In affirming a judgment for the contractor, the Court of Appeals said:

> When two parties make a contract based on supposed facts which they afterwards ascertain to be incorrect; and which would not have been entered into by the one party if he had known the actual conditions which the contract required him to meet, not only Courts of justice but all right thinking people must believe that the fair course for the other party to the contract to pursue is either to relieve the contractor of going on with his contract or to pay him additional compensation. [106 Md. at 230.]

We have very carefully reviewed the record extract in order to determine whether the trial court was clearly erroneous in its conclusions as to the law and the facts. The record extract establishes that the specifications as prepared by Greiner on behalf of Baltimore County were materially wrong and substantially inaccurate. The evidence disclosed no substantial dispute that the conditions as found by Greiner and reported to the County and to the bidders were substantially different from those encountered by Raymond

when it began to perform the work required by the contract. Greiner and the County knew or should have known the representations regarding the deterioration of the piers and the quantities of concrete necessary for the repairs were inaccurate as Greiner had been engaged by the County over a period of years to inspect the underwater portions of the bascule piers. Greiner actually had thirteen contracts with the County between 1968 and 1972 which required Greiner to make underwater inspections of the bascule piers, tremies and piles, and field supervision of the piers.

Greiner, as agent for the County, submitted to Raymond information and plans which represented an average surface deterioration depth of six inches in spite of the fact that Greiner had reports from its divers that indicated the average depth of deterioration was only two inches. Therefore, in its bid proposal, Greiner required a computation based on quantities and information which Greiner knew or should have known was incorrect. To suggest that Raymond, who had been solicited to bid on the job by the County and Greiner, should have conducted diving tests in order to verify the information given it in the plans and specifications prepared by Greiner seems to us to place an undue burden on Raymond. Entirely apart from the substantial cost of any such verification, it is obvious that Greiner required a period of almost four years and innumerable test divings to compile the information necessary to prepare the plans, specifications and bid proposals, and that even in view of that lengthy time frame the information it had was incorrect. We conclude that Raymond was not reasonably able to discover the true facts for itself and was, therefore, entitled to rely on the representations made by the County and Greiner.

As to the materiality of the representations, there can also be no dispute. Raymond established that its bid was conditioned upon the erroneous representation in the contract documents that a total of 230 cubic yards of aggregate concrete would be required to perform the contract. The actual amount required was approximately 114 cubic yards. The bid was based on a unit price per square

yard, and because the County paid only for the actual amount used, the appellant was deprived of over half its contract price. In addition, because of the incorrect information supplied to Raymond, the contractor was required to perform additional work in connection with the use of the prefabricated forming system and to utilize new methods for sealing and anchoring the form bottoms. As a direct result of the variations from the conditions as represented in the plans and specifications, Raymond was unable to complete the project within the 100 days provided in the contract. As Raymond failed to perform within the time specified, the County withheld the sum of $37,000 notwithstanding that performance was impossible within the 100 days required by the contract.

Appellee Baltimore County relies on *Trionfo v. Board of Education of Harford County,* 41 Md. App. 103, 395 A.2d 1207 (1979), in which Judge Thompson of this Court exhaustively discussed the law of a contractor's right to recover on a theory of misrepresentation. There we held, as we hold here, that the plaintiff must establish a right to rely on the misrepresentation. In *Trionfo,* we found no right to rely because the test boring data furnished to contract bidders were supplied only in exchange for a written release from the bidders designed to absolve the board from any responsibility for the accuracy or completeness of the information and to protect the board from assessments for additional work performed pursuant to assumptions made based on the supplied data. No such release provision exists in this contract. We, therefore, find *Trionfo* inapplicable to the present case. We conclude that the trial court erred in holding that the appellant was not entitled to rely on the conditions, quantities and representations contained in the contract. We further hold that the trial court erred in its finding that the appellant was not entitled to compensation for the unforeseen or negligently misrepresented conditions encountered in the performance of the contract.

We perceive an additional error in the trial court's rulings. The contract documents expressly incorporated the specifications of the State of Maryland with the contract

between Raymond and the County. Section 10.09-3 of those specifications expressly provides for an equitable adjustment for major discrepancies in quantities as follows:

> Whenever a final quantity for any Major Contract Item shows that either the Proposal Quantity of said item, or the quantity specified therefor in any Supplemental Agreement has been actually overrun or underrun by more than 25 percent; the Contractor and Commission shall then be allowed an equitable adjustment in time and/or compensation as though said overrun or underrun had been anticipated by the Engineer and ordered, under the provisions of Section 10.04-3.

The term "major contract item" is defined in the State specifications as follows:

> Major Contract Items shall be the original Contract item of greatest cost, computed from the original Contract price and estimated quantity, or lump sum price and such other original Contract items next in sequence of lower cost, computed in like manner, necessary to show a total cost at original prices and quantities of not less than 60 per cent of the original Contract cost and all other Contract items shall be considered as minor items.

The record extract, we think, clearly establishes that the major contract items in this contract were the preplaced aggregate contract amount of $115,000 and the removal of the fender systems amounting to $34,000 and totaling more than 60 percent of the original contract price. The evidence is undisputed that the quantity of preplaced concrete used amounted to a 50 percent underrun of the prescribed quantities set forth in the contract. Under these circumstances, Raymond was entitled to an equitable adjustment in time or compensation. The trial court initially came to the same conclusion, but inexplicably without reliance on either the law or the facts changed that opinion and concluded that Baltimore County was entitled to a

favorable verdict on the issues of the failure to renegotiate and on the issue of an equitable adjustment. The lower court said:

> The other three issues were the failure to renegotiate an equitable adjustment. At one point in the trial, I think I indicated to counsel, that I was really somewhat impressed that this is an issue that the plaintiff has a right to a particular equitable adjustment. I was very impressed by the testimony of Mr. Morris on this issue. He dwelled at length, but after reviewing the contract documents and listening to arguments of counsel, I've come to the conclusion that the defendant is correct that this is just not called for under the contract documents, and I could not, without breaking the rules of the law, allow that amount and I find that I would have to find for the defendant, Baltimore County, on those issues failing to renegotiate, and on the equitable adjustment.

We find nothing in the record extract on the basis of the facts or the law which supports that conclusion.

### III

We find no error in the trial court's granting of Greiner's motion to dismiss Raymond's suit against Greiner on the grounds of misrepresentation at the conclusion of Raymond's case. Raymond contends that Greiner waived its right to file such a motion to dismiss because it offered testimony before the conclusion of the plaintiff's case and that this amounted to a clear violation of Maryland Rule 535. We do not agree. The record discloses that Greiner's counsel read into the record a short portion of the deposition of one of Greiner's executives, the major portion of which had been put into the record by Raymond's counsel. The clearly expressed purpose of the reading of the short excerpt of the deposition was for clarification of the witnesses' testimony. We do not find that this amounted to such a violation of either the letter or the

spirit of Rule 535 as to make Greiner's motion to dismiss a "nugacity." *See Smith v. State Roads Comm.,* 240 Md. 525, 214 A.2d 792 (1965).

It would serve no useful purpose to again restate the five prerequisites of proof required to sustain an action for misrepresentation or deceit. It is sufficient to state that the appellant failed to produce evidence from which could be found or inferred that Greiner intended to *defraud* by reason of the allegedly incorrect information it furnished to Raymond. Even assuming that Greiner was negligent in preparing the information it furnished to the bidders, that would not be sufficient to satisfy the plaintiff's burden as a misrepresentation induced by negligence or ignorance will not sustain an action for fraud. *Peurifoy v. Congressional Motors, Inc.,* 254 Md. 501, 255 A.2d 332 (1969). There was no testimony establishing clear and convincing evidence that Greiner's representations in this case were made for the specific purpose of defrauding the plaintiff. This is particularly so when we note that at the time the information was supplied to the prospective bidders no one had any knowledge as to who the successful bidder would be. It is not contended in appeal that the trial court was otherwise in error with respect to Greiner's motion.

## IV

The trial court was correct in its ruling on the County's motion raising preliminary objection on the ground of sovereign immunity as to the first and second counts of Raymond's declaration which were founded on the torts of fraud and negligent misrepresentation. *See Jekofsky v. State Roads Comm.,* 264 Md. 471, 287 A.2d 40 (1972); *Godwin v. County Commissioners of St. Mary's County,* 256 Md. 326, 260 A.2d 295 (1970).

> *Judgment reversed as to Baltimore County; remanded for new trial as to damages only.*
>
> *Judgment affirmed as to Greiner.*
>
> *Costs to be paid by Baltimore County.*