824 A.2d 986

MARYLAND DEPARTMENT OF PUBLIC SAFETY
& CORRECTIONAL SERVICES

v.

PHP HEALTHCARE CORPORATION.

No. 1962, Sept. Term, 2001.

Court of Special Appeals of Maryland.

May 28, 2003.

184

Alan D. Easoin, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellant.

Philip M. Andrews (Kramon & Graham, P.A., John G. Sakellaris, Bernstein & Sakellaris, on brief), Baltimore, for appellee.

Argued before KRAUSER, SHARER, RODOWSKY and LAWRENCE F. (Retired, Specially Assigned).

KRAUSER, J.

This case presents a contract dispute between the Maryland Department of Public Safety and Correctional Services (Department), appellant, and the PHP Healthcare Corporation (PHP), appellee, over the provision of health care services to the State's prison inmate population in Baltimore, Maryland. It began when the Department issued a solicitation for proposals to provide such services. In response, PHP, among others, submitted a proposal. That proposal was accepted, and the Department and PHP entered into a health services contract.

During the course of that contract, it became apparent to PHP that the facilities housed, on an average, far fewer inmates than PHP anticipated. The miscalculation was costly for PHP. Because it was being paid on a "per inmate" basis, it faced substantially higher monthly costs of operation than it had planned. It blamed its predicament upon what it claimed were misrepresentations by the Department as to the total number of inmates it could expect to service under the contract. It pointed out that the Department had required it, in preparing its proposal, to use a substantially higher figure of inmates than it was inclined to do.

After an exchange of letters failed to produce a solution to this problem, PHP filed a Notice of Claim with the Department's procurement officer, seeking an equitable adjustment in the amount the Department paid PHP for each inmate. It informed the Department that the per capita price PHP used to calculate its proposal "was based on a projection of a number of inmates that was significantly higher than the actual number of average daily populations calculated each month for the facilities in the region." The Department

denied PHP's claim, and PHP appealed that decision to the Maryland State Board of Contract Appeals (Board).

When the Board also denied its claim, PHP filed a petition for judicial review of the Board's decision in the Circuit Court for Baltimore City. So did the Department. While PHP challenged the Board's holding that it was not entitled to an equitable adjustment, the Department challenged the Board's finding that PHP had filed a timely claim. The circuit court agreed that PHP's claim was timely, but disagreed with the Board's finding that PHP was not entitled to an equitable adjustment. It therefore remanded this case to the Board for further proceedings on the issue of damages. The Department then noted this appeal.

The Department presents three issues for our review, which we have reworded and consolidated into two. They are:

I.  Whether the Board of Contract Appeals correctly ruled that PHP was not entitled to additional compensation because the Department had not misrepresented the inmate population and in any event, even if such a misrepresentation had been made, PHP did not reasonably rely on it in preparing its proposal.

II. Whether the Board erred in ruling that PHP's claim had been timely filed.

For the reasons that follow, we shall hold, as to issue I, that the Board did not err in denying PHP's request for an equitable adjustment. Because we do so, we need not reach issue II.

### Facts

In February 1996, the Department solicited proposals from health care providers to provide health care services to inmates and detainees in correctional and detention facilities located in Baltimore City. Responding to that request, PHP Vice President of Operations, Thomas W. Burden, sent a letter, dated February 29, 1996, to Myles Carpeneto, the Department's Director of Procurement Services, requesting,

among other things, that Carpeneto provide PHP with the "expected average inmate population count for each facility covered by this [request for proposals]." He further asked, "Will the State guarantee a minimum population for each site or for the contract as a whole?"

·After receiving Burden's letter, the Department issued Addendum No. 1, dated March 15, 1996. That addendum stated that the total available beds at the facilities in the Baltimore region was 7,246. It also stated that the number of beds "represent the available beds for each facility as identified by the Department and are not related to the billable population." It defined the "Billable Population Count" as "the sum of the average daily populations for the month for each of the facilities in the Region less" a certain category of parolees and probationers and "[i]individuals in the booking process." And, responding directly to Burden's inquiry about whether the State would "guarantee a minimum population," the Addendum stated that "[t]he State will not guarantee a minimum population."

After receiving Addendum No. 1, PHP submitted an "Original Proposal," dated March 26, 1996. This proposal stated that PHP's per capita price was $2,915.03. PHP computed that price by adding its "Primary Services Price," "Secondary Services Price," "Operating Costs," and "Equipment Costs" to arrive at a "Total Health Services Price Proposal" of $18,947,715 and then dividing that amount by 6,500, its estimate of the future number of inmates that would be housed in the Baltimore facilities. That estimate, according to PHP, was based on materials provided by the Department and its "own investigation of historical inmate population data."

PHP then submitted a "Best and Final Financial Offer" or a "BAFO Proposal," dated April 18, 1996. In this proposal, PHP increased its Total Health Services Price Proposal from $18,947,715 to $19,071,846 and its estimate of inmates from 6,500 to 6,850. Dividing the former by the latter, PHP arrived at a new per capita price of $2,784.21. Shortly after that, PHP submitted a second BAFO Proposal, dated May 16, 1996.

In that proposal, the Total Health Services Price Proposal was decreased to $17,436,694 but the divisor remained the same—6,850. Consequently, PHP's new per capita price was $2,545.50.

PHP increased its estimate from 6,500 to 6,850, according to Burden, based on his "best estimate effort, distilling all of the information available to [him], as to what the actual billable population would be." This information included, among other things, the number of beds reported in Addendum No. 1, talks with employees of the "incumbent contractor," and "workload figures" from contracts in other areas of the state. It also included the number of inmates previously serviced, as reported in copies of the incumbent contractor's contracts, furnished by Carpeneto. Still, when asked whether he obtained "historical average daily population figures for the [Baltimore] region," Burden replied, "No. The State wouldn't provide it to us." The reason was that "the region was undergoing change," Burden testified. Specifically, "the two contracts that [PHP] would be replacing were ... being consolidated into one program"; also, the State was "opening up a central [booking] and intake facility," as well as a new prison. Given these changes, Burden stated, "all historical figures were not to be relied upon," in estimating the inmate population for PHP's proposals.

After receiving PHP's second BAFO Proposal, the Department decided that the prices in the proposals submitted by PHP and the only other offeror were too high. According to Carpeneto's testimony before the Board, he informed PHP, at a conference with the offerors, of the need to use a divisor of 7,266 inmates, the number of inmates that "was the budgeted figure [the Department] had been given by the legislature." Carpeneto further stated: "[W]e told [them] ... [the 7,266 number] had a certain amount of reliability to it, however, we could not guarantee that figure, that it could be higher or that it could be lower."

At that conference, Burden questioned Dr. Anthony Swetz, the Department's Director of Inmate Healthcare Services,

about the inmate population under the contract. Later, he claimed, at his deposition, that Swetz had assured him that the number of inmates would be the "least of your problems." But he also conceded that "we never for a minute believed that we would have any more than 6850." As to his confidence that the 7,266 number required by Addendum No. 5 would be the inmate population, Burden said it was "[f]ifty percent."

After the conference, the Department issued Addendum No. 5, stating that "the Agency, is making changes and clarifications . . . in order to have you reduce your Total Price and Per Capita Price." One such change and clarification was that the offerors were to use 7,266 as a divisor. In other words, Addendum No. 5 required the offerors to "base the Total Price and Per Capita Price on the figure of 7,266 inmates." PHP submitted a third BAFO Proposal, dated May 20, 1996, with a Total Health Services Price of $16,544,508 and a divisor of 7,266 inmates. PHP computed its per capita price as $2,276.98.

In June 1996, the Department awarded the "Baltimore Inmate Health Care" contract to PHP. The contract was for "the provision of inmate health services in the Baltimore Region for the period of July 1, 1996 through June 30, 1997." The contract provided that PHP would receive payments monthly, based on the "[Per Capita Price] multiplied by the Billable Population Count." The contract defined the Billable Population Count as "the sum of the average daily populations for the month for the facilities in the Region." The contract stated that the "average daily population will be based on the figures from the Resident Population column of the Average Daily Population report generated monthly by the [Department], but [will] be calculated to exclude" a class of "[i]ndividuals in pretrial status" and of "[p]robationers and parolees." In June 1997, the Department "exercised its option to renew the contract for an additional year."

Several months later, PHP Vice President and CEO, Michael D. Starr, sent a letter, dated November 22, 1996, to

Swetz. In the letter, Starr pointed out "the revenue shortfall resulting from a variance in the number of inmates and increased operating costs resulting from increased intake processing volumes."

With respect to the revenue shortfall, Starr asserted that "[s]ince the inception of this contract on July 1, 1996, the billable population count has been significantly below the level of 7,266 required as the Per Capita Price Divisor in ... Addendum [No.] 5." He also noted that "due to our initial uncertainty regarding the population at risk, PHP's first bid submission used a figure of 6,850 inmates, and we revised this figure upward only after receipt of Addendum [No.] 5." According to Starr, the inmate population count was 6,644 for July, 6,572 for August, 6,457 for September, and 6,474 for October, resulting in an average inmate population for these four months of 6,536.8.

Noting that PHP's contract price was comprised of its Primary Care Service Price, Secondary Care Services Price, Operating Cost, and Equipment Costs, he explained that PHP's "Primary Care Service Price ... is comprised entirely of *fixed* labor costs resulting directly from the contractually required staffing levels." And "[s]ince the level of staffing is fixed by the contract, PHP is unable to reduce staffing and [its] associated costs regardless of the billable count." Consequently, "for each inmate under the prescribed level of 7,266, PHP incurs," he asserted, "an unreimbursed cost of $113.16 per month." The "inmate population shortfall," Starr claimed, had caused a total revenue shortfall of $330,087.72 for July, August, September, and October.

"[T]o avoid submission of a claim to the State for an equitable adjustment," Starr proposed in his letter that the Department consider adding a "Monthly Population Adjustment" to the contract. This adjustment would, according to Starr, "represent the revenue shortfall computed by multiplying the Population Shortfall times the [Primary Care Service Price]."

In a written response to Starr, dated December 19, 1996, Swetz stated that the Department issued Addendum No. 5 "to fix the capita price divisor to eliminate differential pricing and identify the lowest [offeror]." He further stated that the "number represents the number of beds available within the Baltimore region in which the Department may house inmates/detainees. Each offeror had the same opportunity to staff its proposals and to establish its per capita price against that number." Swetz also questioned the accuracy of Starr's statement that PHP's primary care costs were fixed. He proposed that if "PHP can reduce personnel costs and maintain the level of the delivery of treatment services, and amend [its] monthly staffing schedule to our mutual satisfaction, we may be able to reduce your revenue shortfall."

On April 21, 1997, Starr filed, with Carpeneto, a "Notice of Claim" letter requesting modifications to the contract with respect to payment to the contractor and per capita price; and equitable adjustments, damages and other appropriate relief to cover underpayment made to the contractor by the agency because the per capita price was based upon a projection of a number of inmates that was significantly higher than the actual number of average daily populations calculated each month for the facilities in the region, because inmate intakes are substantially higher and therefore, associated expenses for those additional intakes are more costly than projected at the time of contracting.

Following the notice of claim, Starr sent a follow-up letter, dated May 20, 1997, to Carpeneto. Among other things, the letter raised the issue of "Inmate Population Shortages" and claimed that: "By mandating [7,266 as the divisor in Addendum No. 5] and accepting PHP's Total Price, the Department has *de facto* created a fixed per capita reimbursement rate for primary services" and thus "[f]or each inmate below the level of 7,266 PHP is inappropriately deprived of reimbursement for a fixed cost portion of the Primary Services Price." It further asserted that "PHP's total Primary Services Price of $9,866,664 divided by 7,266 equals $1,357.92 or $113.16 per inmate per month." The letter included a chart that com-

pared the "specified" inmate population of 7,266 with the "actual" populations from July 1996 to April 1997 and then calculated a "shortfall" number of inmates for each month. The chart showed a total shortfall of 6,848 inmates from July 1996 through April 1997. Thus, the letter requested an equitable adjustment to be calculated as follows: "6,848 inmate × $113.16 = $774,919.68."

In a letter, dated July 2, 1998, Carpeneto denied PHP's claim, stating that "[a]t no time, either during the solicitation process or in the contract, did the Department state that your firm would be compensated for a specific number of inmates." He further explained that:

> [T]he Department specifically stated in the solicitation documents and during negotiations that, although the Department was providing information about the number of beds in the Baltimore Region, the inmate population in the Region and the divisor that the offerors were to use to determine the Per Capita Price, the Department would not guarantee a minimum population.

After the denial of its claim, PHP filed a Notice of Appeal with the Maryland State Board of Contract Appeals.[1] In a written opinion, the Board denied PHP's appeal. After resolving the issue of the timeliness of PHP's claim in PHP's favor, the Board declared "that the Department's representation in Addendum No. 5 or otherwise of the number of inmates in the Billable Population Count does not constitute an erroneous representation of a material matter that [PHP] was entitled to rely upon." It added that even if "the Department made a positive and affirmative representation as to the number of inmates to be housed in the Baltimore Region, ... [PHP] did not reasonably rely on that number, and may not, therefore, prevail on its claim for an equitable adjustment."

Following the Board's decision, PHP filed a petition in the Circuit Court of Baltimore City for judicial review of that

---

1. In its Notice of Appeal, PHP claimed, as an amount in dispute, $8,806,556.00, plus interest of $329,903.00. According to the Board, PHP's total claim based on population shortfall was $1,292,769.12.

decision; whereupon the Department filed a cross-petition for judicial review. After a hearing, the circuit court issued an order granting PHP's petition for judicial review, reversing the Board's denial of PHP's request for an equitable adjustment, and remanding the matter to the Board to determine the amount of that adjustment. The circuit court also denied the Department's cross-petition for judicial review, and affirmed the Board's finding as to the timeliness of PHP's claim.

From that decision, the Department noted this appeal.

## Standard of Review

When reviewing an administrative agency decision, our role "is precisely the same as that of the circuit court." *Dep't Of Health & Mental Hygiene v. Shrieves,* 100 Md.App. 283, 303–04, 641 A.2d 899 (1994). We review only the decision of the administrative agency itself. *Ahalt v. Montgomery County,* 113 Md.App. 14, 20, 686 A.2d 683 (1996). We "do not evaluate the findings of fact and conclusions of law made by the circuit court." *Consumer Prot. Div. v. Luskin's, Inc.,* 120 Md.App. 1, 22, 706 A.2d 102 (1998) *rev'd in part on other grounds,* 353 Md. 335, 726 A.2d 702 (1999). "Thus, whether the circuit court applied the wrong standard of review is of no consequence if our own review satisfies us that the [Board's] decision was proper." *Giant Food, Inc. v. Dep't of Labor, Licensing & Regulation,* 124 Md.App. 357, 363, 722 A.2d 398 (1999), *rev'd on other grounds,* 356 Md. 180, 738 A.2d 856 (1999). To conduct a proper inquiry of an administrative agency's decision, we " 'must be able to discern from the record the facts found, the law applied, and the relationship between the two.' " *Sweeney v. Montgomery County,* 107 Md.App. 187, 197, 667 A.2d 922 (1995) (quoting *Forman v. Motor Vehicle Admin.,* 332 Md. 201, 221, 630 A.2d 753 (1993)).

In reviewing the decision of the Board, our role "is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *United Parcel*

*Serv., Inc. v. People's Counsel,* 336 Md. 569, 577, 650 A.2d 226 (1994). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Md. State Police v. Warwick Supply & Equip. Co.,* 330 Md. 474, 494, 624 A.2d 1238 (1993) (quoting *State Admin. Board of Election Laws v. Billhimer,* 314 Md. 46, 58, 548 A.2d 819 (1988)).

In making this determination, we must give " 'deference ... not only [to the Board's] fact-findings, but to the drawing of inferences from the facts as well.' " *Id.* (quoting *Billhimer,* 314 Md. at 59, 548 A.2d 819). We must also accord deference to the Board's " 'application of law to those [factual findings], if reasonably supported by the administrative record, viewed as a whole.' " *Berkshire Life Ins. Co. v. Md. Ins. Admin.,* 142 Md.App. 628, 653, 791 A.2d 942 (2002) (quoting *Ins. Comm'r v. Engelman,* 345 Md. 402, 411, 692 A.2d 474 (1997)). " 'When, however, the agency's decision is predicated solely on an error of law, no deference is appropriate and the reviewing court may substitute its judgment for that of the agency." *Warwick,* 330 Md. at 494, 624 A.2d 1238 (quoting *Billhimer,* 314 Md. at 59, 548 A.2d 819). Thus, if the agency's decision " 'is not predicated solely on an error of law, we will not overturn it if a reasoning mind could reasonably have reached the conclusion reached by the agency.' " *Id.* (quoting *Billhimer,* 314 Md. at 59, 548 A.2d 819).

## Discussion

The Department contends that the Board correctly concluded that the Department did not misrepresent the Billable Population Count to PHP and, even if it did, PHP did not reasonably rely on that figure in preparing its proposal.[2] We concur.

---

2. With respect to this claim, the Board stated in its written opinion that while PHP "in certain proceedings on appeal may have referred to this claim as one based on negligent misrepresentation, [PHP] agrees that this claim is not a tort claim but is a breach of contract claim based on

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ A contractor may pursue the Government for damages under a contract for a misrepresentation in contract documents. *T. Brown Constr., Inc. v. Pena,* 132 F.3d 724, 728 (Fed.Cir.1997). To prevail on such a claim, however, "the contractor must show that the Government made an erroneous representation of a material fact that the contractor honestly and reasonably relied on to the contractor's detriment." *Id.* Moreover, " '[a] misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so.' " *Id.* (quoting Restatement (Second) of Contracts § 162(2) (1979)). But, an "intent to mislead is not an essential element of actionable misrepresentation in the breach of contract context. An inadvertent misrepresentation stemming from negligence is fully as damaging as a deliberate one to the party who relies on it to his detriment." *Womack v. United States,* 182 Ct.Cl. 399, 411–12, 389 F.2d 793 (Ct.Cl. 1968) (citations omitted).

▮▮▮▮▮ As noted, a contractor's reliance on the government's statements must be reasonable; that is to say:

> One of the central elements of the doctrine of misrepresentation is that the injured party's reliance upon the statement must have been innocent or reasonable. In the context of government contracting, such a standard is measured from the perspective of what the reasonable contractor would have done when charged with knowledge common within the industry. In general, the test of reasonableness focuses on whether through such knowledge, or through some affirmative signal from the government, the contractor was on notice *not* to rely on the utterance in issue, or that all such statements should be investigated for the reasons given. Failure to heed such warnings leaves any risk created by the alleged misrepresentation with the contractor, and renders a contractor unable to recover under a theory of misrepresentation.

---

an alleged erroneous representation [by the Department]." PHP does not dispute this.

*Gregory Lumber Co. v. United States,* 11 Cl.Ct. 489, 503 (Cl.Ct.1986) (emphasis in original) (citations omitted).

PHP contends that the Board erred in concluding that the Department "made no 'legally binding representation of the future Billable Population Count,' entitling PHP to an equitable adjustment." In support of that claim, PHP claims that "[t]he Department, by requiring that the proposals be based on 7,266 inmates and defining that number as the 'Per Capita Price Divisor,' directly represented in Addendum [No.] 5 that the contractors should anticipate that the average Billable Population Count would be 7,266."

In its written opinion, the Board stated that "[t]he number of inmates in the Billable Population herein significantly affects the Contract Price and is thus a material matter." Yet, the Board found that "the Department's representation in Addendum No. 5 or otherwise of the number of inmates in the Billable Population Count does not constitute an erroneous representation of a material matter that [PHP] was entitled to rely upon." The solicitation of bids, the Board noted, did not "provide any specifics concerning what the population count would actually be during the term of the [c]ontract." Instead, as the Board observed, "the [offerors] were left to determine their own number in submitting their proposals and were not provided with a minimum number of inmates that would be housed in the Baltimore Region."

Nor did the Department's position on this issue vary during the bid solicitation process. In response to PHP's pre-proposal request for a "best estimate" of the number of inmates, the Department issued Addendum No. 1. While indicating that the number of "available beds" in the Baltimore Region was 7,246, that addendum expressly stated that 7,246 "represent[s] the available beds ... and [was] not related to the billable population." And in direct response to PHP's inquiry, it declared, "The State will not guarantee a minimum population."

After Addendum No. 1 was issued, PHP submitted a proposal using an estimated population count of 6,500 as the divisor. Once PHP "ascertained the number prior [offerors]

used in the region as a population count and the region's likely staffing needs," PHP submitted a proposal using 6,850 as a divisor. The Department, as noted earlier, thereafter decided that the proposals submitted by PHP and the other offeror were too high. It therefore issued Addendum No. 5, requiring that "[t]he offeror ... base the Total Price and Per Capita Price on the figure of 7,266 inmates."

But the Department's Director of Procurement Services, Myles Carpeneto, explained to PHP that this number was not the Department's estimate of the average monthly inmate population but "the budgeted figure [the Department] had been given by the Legislature." In other words, the Department had been given, according to Carpeneto, "money to handle 7266 inmates." Although Carpeneto stated that the figure "had a certain amount of reliability," it reminded PHP "that it could be higher or that it could be lower" and flatly stated that the Department "would not guarantee that figure."

The Board acknowledged, however, that, at a conference, a PHP representative asked the Department's negotiating team if they expected 7,000 inmates to be in the Baltimore Region, to which the Department's Director of Inmate Health Care Services, Dr. Anthony Swetz, responded: " 'Oh, you don't have to worry about that; we'll have plenty of inmates. As a matter of fact, that will be the least of your problems.' " [3] But the Board found that this statement was not "a legally sufficient basis for [PHP] to rely on an average of 7,266 inmates per month in the coming year to forecast its profit picture under the Contract." We agree, particularly in light of the Department's repeated declarations that it was not guaranteeing the number of inmates.

Finally, the Board found that, even if "the Department made a positive and affirmative representation as to the number of inmates ... [PHP] did not reasonably rely on that number, and may not, therefore, prevail on its claim for an equitable adjustment." In so finding, the Board cited many of

---

3. The Board noted that Burden gave similar testimony at the hearing.

the same facts it relied upon in determinating that there had been no misrepresentation by the Department.

The Board pointed out that "[t]he procurement documents did not provide offerors with a prediction of the billable inmate population for the region." And, prior to awarding the contract to PHP, the Department declined to provide any estimate of the number of inmates that would be housed at the facilities in question, despite PHP's request to do so. In fact, the Department did not even provide, as the Board noted, "historical Average Daily Population figures."

According to the Board, PHP understood the Department's hesitancy in providing such figures. It noted that PHP's Vice President, Thomas W. Burden, testified, at his deposition, that " 'all historical figures were not relied upon' because the population capacities of correctional facilities in the State were changing due to the opening of two new prisons, one in Baltimore and the other in Western Maryland."

The Board further observed that PHP conducted its own investigation of what the likely future inmate population would be, basing it on a "prior offeror's experience in the region and the region's likely staffing needs." And that "pre-award investigation determined that 6,850 was the likely population count for the region."

Furthermore, Burden testified that, until the issuance of Addendum No. 5 and Dr. Swetz's comments at the conference—the influence of which the Board discounted—"we never for a minute believed that we would have any more [inmates] than 6850." He confirmed that, after Addendum No. 5 was issued, his confidence in 7,266 as a proper estimate was "[f]ifty percent." And the Board found that Carpeneto's statement that the Department would not guarantee 7,266 as a floor, put PHP on notice not to rely on that figure.

After addressing the reliance issue, the Board stated, "[i]n summary we have before us a record that reflects that [PHP] seeks to recoup alleged losses sustained as a result of its business decision." It explained:

It is undisputed that when [PHP] submitted its cost proposal in response to Addendum No. 5, it was free to increase its proposal, i.e., the numbers comprising the numerator, to cover its uncertainty concerning the actual regional population that would be realized. However, the record reflects that [PHP], an experienced contractor whose representatives were intimately familiar with the importance of prison popu-lation [sic] and how such population affects correctional contracts, exercised its business judgment and chose not to increase the numbers comprising the numerator because it believed if it raised the numbers it would not obtain the Contract. Thus, in order to obtain the Contract, [PHP] assumed the risk that its Per Capita Price, submitted in response to Addendum No. 5, might undercompensate it.

In support of its conclusion that PHP "could have adjusted its final cost proposal to protect itself against the risk of population shortfall," the Board cited the following excerpt of Burden's deposition testimony:

Q. But you could have increased your fee in your final proposal, so as to give you a higher per-capita rate and, therefore, provide for the contingency of the population falling short of the 7266 number?

A. We could have also not bid.

Q. I understand.

A. I'm not sure that the results would have been any different. The goal was to achieve a winning price, making the best use of all the information provided us to the State and, you know, through some, you know, mathematical machination, come up with a—an approach that basically shifted the cost from one place to another wouldn't have gotten you to a winning price. So why bother?

Q. So its fair to say in preparing your final proposal, you're balancing your assessment of the risks involved in you winning the bid at the proposed price against having the low price and, therefore, being a successful [offeror]?

A.   Oh, sure.   That's the nature of the contract.

Yet, PHP argues that it was "entitled to rely upon the [Department's] representations."   It claims that "[t]o the extent the Department now alleges that it may have verbally suggested that it would not guarantee its representation, even assuming that such a communication actually occurred, it would not approach the specific exculpatory and disclaimer provisions required to relieve the Department of its responsibilities associated with making erroneous representations."

In support of that argument, PHP invokes *Raymond International, Inc. v. Baltimore County*, 45 Md.App. 247, 412 A.2d 1296 (1980) and *Joseph F. Trionfo & Sons, Inc. v. Board of Education*, 41 Md.App. 103, 395 A.2d 1207 (1979).   In *Raymond*, PHP claims, this Court "declined to relieve the Government of responsibility for inaccurate representations," despite "extensive and direct exculpatory clauses intended to place the responsibility and risk of inaccurate information upon the contractor."   And, in *Trionfo*, PHP maintains that we stressed "how detailed and specific a release must be to absolve the procuring agency of responsibility for its representations."

In *Raymond*, a contractor entered an agreement with Baltimore County to repair the piers of a bridge.   45 Md.App. at 250, 412 A.2d 1296.   After starting the repairs, the contractor claimed it discovered that the specifications provided by the County's engineer were inaccurate.   Consequently, the contractor maintained, he had to perform additional work for which he should be compensated.   *Id.* After a bench trial, the circuit court held, among other things, that Raymond International was not entitled to the extra compensation it sought and that the contract had placed the burden of reasonable inspection on it.   *Id.* at 251, 253, 412 A.2d 1296.

On appeal, we defined the issue as "whether [the contractor] was required to verify independently the information upon which [the contractor] based its bid, or whether [the contractor] was justified in relying on the information supplied by the County and its engineer as to the plans and specifications for the project."   *Id.* at 253–54, 412 A.2d 1296.   We concluded

that the contractor was not "reasonably able to discover the true facts for itself and was, therefore, entitled to rely on the representations made by the County and [engineer]." *Id.* at 258, 412 A.2d 1296. We observed that specifications prepared by the engineer for the County were "materially wrong and substantially inaccurate" and that the conditions the engineer found and reported to the County and bidders "were substantially different than those encountered by [the contractor] when it began to perform the work required by the contract." *Id.* at 257–58, 412 A.2d 1296. Furthermore, we noted that the County and engineer "knew or should have known the representations . . . were inaccurate" as the engineer had been inspecting piers for the County for years. *Id.* at 258, 412 A.2d 1296. Given the nature of the information at issue and the expense and difficulty in acquiring it, we concluded that it would have imposed a substantial cost on the contractor to verify the specifications. *Id.*

*Raymond* obviously presents a fact pattern substantially different from the one presented by this case. In *Raymond*, an engineer, with many years experience in inspecting the County's piers, prepared inaccurate specifications which were then given to the contractor for its use and reliance. Moreover, in that case, it would have been too costly, we found, for the contractor to obtain the information on its own. But, in this case, the Board found, and we agree, that Addendum No. 5's requirement that the offerors use 7,266 as a divisor was not a specification nor was it intended as information upon which PHP could rely. Addendum No. 5, as the Board noted, "was issued for the purpose of obtaining a lower per Capita Price from the two contractors then in competition by having them use the higher divisor." "The Agency," Addendum No. 5 stated, "is making changes and clarifications . . . in order to have you reduce your Total Price and Per Capita Price."

Nor does *Trionfo* support PHP's reliance claim. In that case, a contractor was awarded a bid to construct a school by a board of education. While excavating the site, the contractor's subcontractor encountered a "substantial quantity of rocks in the subsurface," which caused it more difficulty in excavating

material from the site than originally contemplated. 41 Md. App. at 104, 395 A.2d 1207. After compensating the subcontractor for the additional work, the contractor sought reimbursement from the education board because of the "inaccurate and misleading representations made by [the board] concerning the nature of the subsurface conditions on the site." *Id.*

The parties' contract placed the responsibility of excavation on the contractor and required that the contractor not rely on subsurface information provided by the owner and architect. The contract also required that bidders make their own investigations and that neither the owner nor architect would be responsible for additional compensation for excavation done under the contract. *Id.* at 105, 395 A.2d 1207. In addition, the contractors obtained test boring data by submitting a written request which "release[d] the Owner and Architect from any responsibility or obligation as to its accuracy or completeness or for any additional compensation for work performed under the contract due to assumptions based on use of such furnished information." *Id.*

Still, the contractor argued that it was entitled to rely on the subsurface soil data furnished by the education board, despite the release it executed to obtain the test boring data and the contracting provisions disclaiming its accuracy. *Id.* at 105, 395 A.2d 1207. We disagreed. We held that the contractor under the circumstances had no right to rely on the test boring data. *Id.* at 111, 395 A.2d 1207. We stated that "[i]n exchange for the privilege of obtaining the subsurface soil data, compiled by appellee for its own use, appellant expressly released appellee from any responsibility for the accuracy of the information and from any liability for work which was unanticipated due to assumptions based on that information." *Id.* We further pointed out that the excavation work under the contract included any subsurface material encountered, that the contract made no representation about subsoil conditions, that the test boring data was excluded from contract documents, and that test boring data could only be obtained by the

bidders in exchange for the release. *Id.* at 111–12, 395 A.2d 1207.

PHP observes that its contract with the Department contained no release provision similar to that found in *Trionfo.* But *Trionfo* does not stand for the proposition that, absent a provision releasing an owner from responsibility for the accuracy of information furnished to a bidder, a bidder is entitled to rely on such information. Although the contract at issue here does not contain such a provision, it was clear, from the verbal and written representations made by the Department to all offerors, including PHP, that it was assuming no responsibility for estimating or guaranteeing the number of inmates at its Baltimore facilities.

We therefore hold that the Board's conclusion that "the Department's representation in Addendum No. 5 or otherwise of the number of inmates in the Billable Population Count does not constitute an erroneous representation of a material matter that [PHP] was entitled to rely upon" is supported by substantial evidence.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED; CASE REMANDED TO THE CIRCUIT COURT WITH INSTRUCTIONS TO AFFIRM THE DECISION OF THE AGENCY; COSTS TO BE PAID BY APPELLEE.**